IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Export-Import Bank of the Republic of China, | ) )  Civil No. 97 CIV 3090 (LAK) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| Republique du Niger, | ) ) |
| Defendant. | ) ) |

**EXELON GENERATION COMPANY LLC'S MEMORANDUM IN OPPOSITION TO EXPORT-IMPORT BANK'S MOTION BROUGHT BY AN ORDER TO SHOW CAUSE FOR PERMISSION TO SERVE A RESTRAINING NOTICE AND FOR A TEMPORARY RESTRAINING ORDER**

Export-Import Bank of the Republic of China ("Ex-Im Bank") is the holder of a judgment obtained in 1998 against the Republique du Niger ("Niger"). Ex-Im Bank claims, to date, Niger has failed to make any payments to satisfy the judgment.

Seeking to collect on that judgment, Ex-Im Bank has brought the instant motion, by order to show cause, in an effort to restrain Exelon Generation Company, LLC ("Exelon") from making a contractual payment to La Societe De Patrimoine Des Mines Due Niger ("SOPAMIN"), for Exelon's accepted delivery on January 15, 2015 of natural uranium concentrates made pursuant to a supply contract between Exelon and SOPAMIN. Neither Exelon nor SOPAMIN was, or is, a party to the litigation between Ex-Im Bank and Niger (the "Niger Litigation") and Exelon owes no money to the judgment debtor, Niger.

Nevertheless, notwithstanding that (a) Exelon owes no money to Niger, (b) SOPAMIN was not a party to the Niger Litigation, (c) this Court may not have jurisdiction over SOPAMIN, and (d) SOPAMIN is a separate and distinct legal entity from Niger, Ex-Im Bank improperly

seeks to invoke Section 5222 of the New York Civil Practice Laws and Rules to interfere with the Exelon-SOPAMIN contract by restraining Exelon from making its contractual payment to SOPAMIN (due by February 15, 2015).

Section 5222 of the New York Civil Practice Laws and Rules provides a state-law mechanism by which a judgment creditor may issue a restraining notice against its judgment debtor or other obligor (holding property of the judgment-debtor) from selling, assigning, transferring, or interfering with any property in which that debtor or obligor has an interest. In essence, it is a state and subject-matter-specific method of receiving an injunction in aid of collecting on a judgment, and sets forth specific procedures and requirements with which the judgment creditor must comply.

Here, Ex-Im Bank seeks to use this mechanism to enjoin not the judgment debtor or obligor, but to enjoin Exelon, a third-party, from complying with its contractual obligations to another third-party (SOPAMIN). It also attempts an end-run around Section 5222's requirements by seeking the same relief through the "extraordinary remedy" of a TRO. *See Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 391 (S.D.N.Y. 2011). Ex-Im Bank cannot begin to meet the requirements for the extraordinary and emergency relief it seeks.

## BACKGROUND

In short, Exelon owns and operates nuclear power plants throughout the United States. Natural uranium concentrates (sometimes referred to as $U_3O_8$, or triuranium octoxide) are essential to the generation of nuclear power and the continued, uninterrupted supply to consumers of nuclear power. Exelon and SOPAMIN are parties to an Agreement dated May 24, 2010 (as amended, the "Agreement"), pursuant to which Exelon purchases from SOPAMIN quantities of natural uranium concentrates. The Agreement runs through 2016.

2

Under the Agreement, SOPAMIN makes to Exelon two deliveries each year of natural uranium concentrates. Immediately after each delivery, SOPAMIN issues an invoice, with payment due in 30 days. On January 15, 2015, Exelon received its most recent delivery from SOPAMIN. Pursuant to a Stipulation dated December 18, 2014, between Exelon and Ex-Im Bank (in connection with various post-judgment discovery served by Ex-Im Bank), Exelon agreed to provide Ex-Im Bank with 25 days' notice prior to making any payment to SOPAMIN. On January 19, 2015, Exelon provided Ex-Im Bank with such notice of its intention to make a payment to SOPAMIN. Three weeks later, and less than a week before Exelon is scheduled to make its contractually required payment for natural uranium concentrates, Ex-Im Bank brought this ill-conceived motion to attempt to restrain Exelon from making payment to SOPAMIN.

**I.     As a Matter of Law, No Restraint Can Issue Against SOPAMIN Because There Has Been No Judicial Finding That SOPAMIN is the Alter Ego of Niger.**

Ex-Im Bank's sole purported basis for obtaining a restraining order against Exelon is Section 5222. However, Exelon owes no money to, and is holding no property of, the judgment debtor, Niger.

Ex-Im Bank seeks the unprecedented extension of Section 5222 to restrain Exelon's payment to SOPAMIN based entirely on the speculative allegation that SOPAMIN is the alter ego of Niger. New York law is clear, however, that mere allegations that an entity is an alter ego of the judgment debtor does not permit the issuance of a restraining order against that separate entity under Section 5222. Instead, there must be an ***actual adjudication*** that the entity is the alter ego of the judgment-debtor ***before*** such a restraint can issue against the entity. *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 392-93 (S.D.N.Y. 2003) ("Although the plaintiff may attempt to prove the alter ego liability of Reich and Jossem as part of a judgment enforcement proceeding, their assets may not be restrained pursuant

3

to § 5222 until their alleged alter ego status has been adjudicated and their liability for the previous judgment determined."); *Fischer Diamonds, Inc. v. Andrew Meyer Designs, LLC*, No. CV-06-2737 (CPS), 2006 WL 1720431, at *2 (E.D.N.Y. June 21, 2006) (refusing to issue preliminary injunction to alleged alter ego of debtor where issue of whether the parties were alter egos had yet to be adjudicated); *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 977 N.Y.S.2d 610, 621 (Sup. Ct. 2013) (refusing to issue preliminary injunction based on alter ego claim where alter ego issue had not been adjudicated). Here, Ex-Im Bank's attempt to restrain Exelon—a third party—from fulfilling its contractual obligations to SOPAMIN based on conclusory allegations that SOPAMIN (over which the Court has not established jurisdiction) is the alter ego of Niger is, without question, outside the reach and scope of Section 5222.

Ex-Im Bank has not cited any authority to support its position. Although Ex-Im Bank asserts "New York courts routinely uphold the restraint of funds on a prima facie showing that the corporate veil between the third party and the judgment debtor ought to be pierced" (Brief at 14), the cases cited by Ex-Im Bank actually demonstrate that the alter ego claim must be ***actually adjudicated*** before a restraint can issue. *See Thompson v. Pollack*, 873 N.Y.S.2d 173, 175 (2d Dept. 2009) (alter ego claim was adjudicated based on submitted evidence prior to issuance of restraint); *see also Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 378 N.Y.S.2d 859, 863-64 (Sup. Ct. 1975) (same); *Sumitomo Shoji N.Y., Inc. v. Chem. Bank N.Y. Trust Co.*, 263 N.Y.S.2d 354, 356 (Sup. Ct. New York County 1965), *aff'd* 267 N.Y.S.2d 477 (1st Dept. 1966) (same). No such finding has been made here, or anywhere else, and as described below, no such finding is warranted.

**II.     Ex-Im Bank Cannot Establish the Requirements for the Issuance (or Extension) of a TRO.**

A plaintiff seeking a temporary restraining order must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Litwin*, 865 F. Supp. 2d at 391-92 (quotation omitted). None of the factors are in Ex-Im Bank's favor.

> **A.     Ex-Im Bank Cannot Succeed on the Merits Because It Cannot Meet Its Burden Under the Foreign Sovereign Immunities Act ("FSIA") to Show That the Payments are Subject to Execution.**

Ex-Im Bank concedes that, under the FSIA, the payments Exelon makes to SOPAMIN are not available to satisfy Ex-Im Bank's judgment against Niger unless Ex-Im Bank can establish: (1) that SOPAMIN is the alter ego of Niger *and* (2) that the FSIA's requirements of 28 U.S.C. § 1610(a) are met, ***including*** that the payments to SOPAMIN by Exelon are "used for a commercial activity in the United States." (Mem. at 8, 13; *see Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 283 (2d Cir. 2011)). In the FSIA context, there is a strong "presumption that assets of a foreign government instrumentality [such as SOPAMIN] could not be executed upon to satisfy a judgment against a parent foreign government," and that strong presumption "can be 'overcome only if the party seeking attachment carrie[s] its burden of demonstrating that the instrumentality's separate juridical status [i]s not entitled to recognition.'" *Walters*, 651 F.3d at 298 (quoting *EM Ltd. v. Republic of Argentina,* 473 F.3d 463, 477 (2d Cir. 2007)); *Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir. 1984) (assets of Chile's wholly owned airline are not subject to execution to satisfy a default judgment obtained against Chile). And even if the presumption were overcome, the assets would have to fall within one of the section 1610(a) exceptions to immunity from execution, *Letelier*, 748 F.2d at 795, all of which

5

require that the assets are "used for a commercial activity in the United States," 28 U.S.C. § 1610(a). It is, thus, Ex-Im Bank's burden to establish (in a proper proceeding against SOPAMIN) that each of these requirements are satisfied. *Letelier*, 748 F.2d at 795 (the "creditor seeking execution against an apparently separate entity" has "the burden of proving that [the instrumentality is] not entitled to separate recognition" and that "the property to be attached is subject to execution"). Ex-Im Bank does not come close to meeting its burden on either requirement.

       **1.**      **Ex-Im Bank is unable to demonstrate that SOPAMIN is Niger's alter ego.**

Contending that it is likely to succeed in demonstrating that SOPAMIN is the alter ego of Niger, Ex-Im Bank first relies on the Supreme Court's *Bancec* decision, but fails to acknowledge the strength of the *Bancec* presumption that foreign sovereigns and their instrumentalities are separate. Under *Bancec*, "government instrumentalities established as juridical entities distinct and independent from their sovereign ***should normally be treated as such***." *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*") (emphasis added).[1] And for good reason. Not only is "[s]eparate legal personality . . . an almost indispensable aspect of the public corporation," but recognizing the separateness of foreign instrumentalities is compelled by "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations." *Id*. at 625; *see also Dole v. Patrickson*, 538 U.S. 468,

---

[1] Notably, in *Bancec*, Banco Para El Comercio Exterior De Cuba (Bancec) was a party to the action able to litigate the validity of the right of set-off claimed by First National City Bank. Here, SOPAMIN is not a party to the action and Ex-Im Bank has not alleged, let alone established, any basis for jurisdiction over SOPAMIN. In addition, Bancec was dissolved and its assets distributed to the Cuban Government – SOPAMIN continues to exist as a separate legal entity. And finally, Bancec had involved the jurisdiction of the U.S. Court – accepting the benefits of U.S. law and the U.S. judicial system. SOPAMIN has not invoked any U.S. jurisdiction or asserted a claim in a U.S. Court.

474 (2003) (applying, in the foreign sovereign context, the "basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities"); *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d Cir. 2000) (describing the "strong presumption of separateness" between an instrumentality and the state); *Letelier*, 748 F.2d at 795 ("*Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness . . .").

The Supreme Court has identified two limited circumstances where the presumption of a foreign instrumentality's separate legal status may be disregarded: where the instrumentality "is so extensively controlled by its owner that a relationship of principal and agent is created"—*i.e.*, where the foreign sovereign's conduct rises to the level of "abus[ing] the corporate form"—and where recognizing the instrumentality's separate status "would work fraud or injustice." *Bancec*, 462 U.S. at 629; *see also Letelier*, 748 F.2d at 794 ("The *Bancec* Court held that a foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice.").[2] "In conducting the 'extensive control' test, courts examine whether the sovereign's level of involvement in 'day to day' operations exceeds the normal supervisory control exercised by a corporate parent over a subsidiary, or whether the sovereign and the instrumentality were 'operated as a single enterprise.'" *Cortez Byrd v. Corporacion Forestal y Indus. de Olancho, S.A.*, 974 F. Supp. 2d 264, 270 (S.D.N.Y. 2013) (citation omitted); *see also Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 279 (S.D.N.Y. 2010) ("Plaintiff must demonstrate that the Romanian government exercised sufficient control over the day-to-day operations of BCR so as to establish a relationship of principal and agent.").

---

[2] Of course, this presumes jurisdiction over the foreign instrumentality – as in *Bancec* and *Letelier* – something not present in this case.

Ex-Im Bank makes no showing of such complete day-to-day control by Niger over SOPAMIN.  Instead, it merely contends that: (1) Niger created SOPAMIN by ordinance; (2) Niger owns 98% of SOPAMIN's shares; (3) Niger appoints nine of SOPAMIN's eleven board members by decree of various government Ministers who represent Niger on the board of directors (the prerogative of most majority shareholders); (4) SOPAMIN conducts mining operations "on behalf of the Republic of Niger"; (5) Niger, as 98% shareholder, receives dividends from SOPAMIN (which one would expect given Niger's stake in the company); (6) while in Niger, an Exelon official met the Minister of Mines and had a "very brief[]," non-substantive meeting with the Prime Minister (evidence of nothing); and (7) SOPAMIN's budget "appears to be controlled by Niger" (an assertion that is unsupported).  These factors fall far short of establishing Niger's day-to-day control, and indeed most simply reflect the normal structuring of a wholly-owned but legally-separate corporate relationship.  In addition, the leading cases noted below further confirm that such facts are not sufficient to sustain Ex-Im Bank's burden here.

      Notably, Ex-Im Bank fails to cite a single case from this District or the Second Circuit in support of its argument that Section 5222 can be extended to reach obligations owing to non-debtor, non-party, governmental entities on the basis of rote allegations of alter-ego status.  (If that was the case, the world economy could grind to a halt with parties issuing restraining notices against each and every governmental entity and state-agency in an effort to satisfy judgments against the foreign sovereigns simply by parroting the legal buzzwords for alter ego liability).  That an outlier case may find an alter ego relationship on a lesser showing than required in the Second Circuit does not displace the general requirement of extensive state involvement in the instrumentality's day-to-day operations.  In any event, even the cases Ex-Im Bank cites involved a level of control over the instrumentality that far surpasses Ex-Im Bank's unsubstantiated

allegations regarding SOPAMIN. In *McKesson Corp. v. Islamic Republic of Iran*, the court of appeals agreed with the district court that Iran exercised "extensive involvement in the day-to-day operations of Pak Dairy." 52 F.3d 346, 352 (D.C. Cir. 1995). Indeed, "[r]outine business decisions, such as declaring and paying dividends to shareholders and honoring the dairy's contractual commitments, were dictated by Iran through the Financial Organization and the other government representatives on Pak Dairy's board." *Id*. at 351-52. And with regard to the transaction at issue in the case, the board of the instrumentality "deferred its decision to withhold dividends from McKesson so that" the government representatives could confer with their superiors, directly involving "Iran's Cabinet Ministers (and officials answerable to them) . . . in this decision-making process." *Id*. at 352. Likewise, in *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, the government not only appointed a majority of the board of directors but also "require[ed] that all checks in excess of approximately $25,000 be signed by one of the government appointed directors" and that a government agency "approved all invoices . . . exceeding approximately $13,000." 616 F. Supp. 660, 666 (W.D. Mich. 1985). The "evidence" submitted by Ex-Im Bank falls far short of establishing such extensive control by Niger over the minutiae of SOPAMIN's day-to-day operations.

That Niger owns 98% of SOPAMIN's shares and appoints nine of SOPAMIN's eleven board members (Mem. at 10) hardly supports a conclusion of alter ego status. *See Gen. Star Nat'l Ins.*, 713 F. Supp. 2d at 279 ("[T]he exercise of power incidental to majority stock ownership cannot form the basis for disregarding the corporate form . . . . Control over the board of directors by means of shareholder voting rights is a prerogative of any majority shareholder and, therefore, is not at all dispositive of the issue presented here."); *see also Seijas v. Republic of Argentina*, 502 F. App'x 19, 21-22 (2d Cir. 2012) ("The appointment of BNA's directors evidences, at most, that

Argentina exercised its powers as BNA's sole shareholder . . . .  Further, even if Argentina took an active role in overseeing the membership of BNA's board—as it was entitled to do as BNA's sole shareholder—we agree with the district court that this, by itself, does not evidence the 'extensive control' of BNA's day-to-day activities . . . or 'abuse of corporate form,' . . . necessary to demonstrate a reasonable basis for concluding that BNA was Argentina's alter ego . . . ."); *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989) ("The two factors of 100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the juridical entities."); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563 (11th Cir. 1987) ("Argentina's 100% ownership of Aerolineas' stock was insufficient to overcome the presumption of separate juridical existence.").  Similarly, Niger's receipt of dividends from SOPAMIN (Mem. at 11) amounts to nothing more than a standard benefit afforded to any shareholder.

In addition, a statement that SOPAMIN conducts mining operations "on behalf of the Republic of Niger" (Mem. at 11) and the fact that while in Niger, an Exelon official met the Minister of Mines and had a "very brief[]," non-substantive meeting with the Prime Minister (*id*. at 12) likewise cannot overcome the strong presumption of SOPAMIN's independent status.  Neither factor demonstrates control over SOPAMIN's day-to-day activities.  Indeed, carrying out commercial activities on behalf of the state through a separate corporate entity is inherent in the very nature of an instrumentality and is the normal practice for sovereigns.  *Bancec*, 462 U.S. at 624 ("Increasingly during this century, governments throughout the world have established separately constituted legal entities to perform a variety of tasks.").  Were it otherwise, SOPAMIN simply would be a private corporation.

10

Finally, Ex-Im Bank hypothesizes that SOPAMIN's budget "appears to be controlled by Niger." (Mem. at 11-12.) Even if Ex-Im Bank could establish this point, that fact would not establish that SOPAMIN is an alter ego of Niger. "[I]t is not at all remarkable for a parent organization to supervise the 'finance and capital budget decisions' and to be responsible for the 'articulation of general policies and procedures' for a subsidiary." *California v. NRG Energy Inc.*, 391 F.3d 1011, 1025 (9th Cir. 2004) (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)). "These areas of cooperation are completely characteristic of a parent-subsidiary operation, and not at all like a principle-agent relationship," as required under *Bancec*. *Id*.

Ex-Im Bank's effort to establish SOPAMIN as an alter ego of Niger is wholly inadequate to overcome the strong presumption in favor of SOPAMIN's separate status – and certainly not the basis on which a restraint should issue.

> 2. **Ex-Im Bank cannot demonstrate that the funds are "used for commercial activity in the United States."**

Even if Ex-Im Bank could demonstrate that SOPAMIN is Niger's alter ego, Ex-Im Bank still must demonstrate that SOPAMIN's assets are subject to attachment and execution under Section 1610(a) of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(a). *See EM Ltd*., 473 F.3d at 480-481 ("Even if we agreed that the Decrees effectively converted all of BCRA's reserves . . . into attachable assets of the Republic, we could not authorize the pre- or postjudgment attachment of the FRBNY Funds unless we found that the account had become property of the Republic 'used for a commercial activity in the United States.'" (quoting 28 U.S.C. §1610(a)). As Ex-Im Bank acknowledges (Mem. at 8), SOPAMIN's assets are only available to satisfy the judgment against Niger if the assets are "used for a commercial activity in the United States." 28 U.S.C. §1610(a).

11

Ex-Im Bank makes no showing whatsoever that the contractual payments from Exelon are "used for a commercial activity in the United States." Instead, Ex-Im Bank candidly admits that "the funds are *proceeds from* a commercial contract for the purchase and sale of uranium concentrates." (Mem. at 13-14 (emphasis added).) But, as the Second Circuit recently explained in another case in which Ex-Im Bank attempted to execute upon the assets of an instrumentality, in determining whether the "used for a commercial activity in the United States" requirement is met, the focus is not on the *source* of the funds, but rather on *the use to which the sovereign puts them*. *Export-Import Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90-91 (2d Cir. 2014) ("We do not consider the nature of the services provided in Grenada by the Statutory Corporations in exchange for the Restrained Funds, because the source of the property is irrelevant to the section 1610(a) analysis. Instead, we focus on the use to which Grenada puts—or clearly intends to put, by virtue of some formal designation or other specific means—the funds at issue."); *see also Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 CIV. 11327 TPG, 2012 WL 983564, at *5 (S.D.N.Y. Mar. 22, 2012) ("What matters under Section 1610(a) is what the property is used for, not how it was generated or produced.") (internal quotation marks and alteration omitted). Accordingly, the Second Circuit held that funds "devoted to 'carrying out public functions in Grenada,' and 'used for the maintenance of facilities and services in Grenada' . . . fail both the 'commercial use' and the 'in the United States' prongs" of section 1610(a), and thus are immune from execution. *Id*. at 91.[3]

As noted above, Ex-Im Bank makes no showing that SOPAMIN uses the Exelon payment for commercial activity in the United States – as required by §1610(a). Ex-Im Bank makes no

---

[3] Given that Ex-Im Bank was a party to *Export-Import Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90-91 (2d Cir. 2014), one would have expected Ex-Im Bank to be aware of, apprise the Court of, this relevant precedent with respect to this issue.

claims of how and where the funds will be used. This alone is sufficient grounds to deny Ex-Im Bank's application.

### 3. An adverse inference about SOPAMIN's separate juridical status is wholly inappropriate.

Failing to demonstrate a likelihood of success on the merits, Ex-Im Bank attempts to save its motion by requesting that this Court make an adverse inference that "*Niger* exercises sufficient control over SOPAMIN such that a principal-agent relationship exists" "due to *Niger's* refusal to participate in post-judgment proceedings." (Mem. at 15-16 (emphasis added).) An adverse inference about SOPAMIN's separate juridical status is wholly inappropriate.

The Second Circuit has held that it is improper to "determine[] evidentiary issues adversely to [the instrumentality] based solely on the [state's] failure to comply with discovery requests," absent a finding "based on independent evidence that the actions of [the instrumentality] and [the state] are one and the same." *Letelier*, 748 F.2d at 795 n.2; *see also id.* ("Rule 37 sanctions ensure that a party will not benefit from non-compliance with discovery orders. Yet, one party to litigation will not be subjected to those sanctions because of the failure of another to comply with discovery, absent a showing that the other party controlled the actions of the non-complying party."); *Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, No. 10 CIV. 5256 KMW DCF, 2013 WL 3970823, at *6 (S.D.N.Y. Aug. 2, 2013) ("[A] court may not sanction a foreign instrumentality for discovery violations committed by its sovereign."). The injustice is even greater when the party against whom the inference is sought is not a party to the dispute. Ex-Im Bank's request for an adverse inference is based entirely on *Niger's* conduct with respect to discovery issued to *Niger*—and *Niger* alone.[4]

---

[4] Ex-Im Bank does not and cannot argue that **Exelon** failed to comply with the subpoenas issued to it. Indeed, Exelon produced documents and was deposed by Ex-Im Bank despite not even being an obligor to Niger.

### B. Ex-Im Bank is Not Likely to Suffer Irreparable Harm.

Ex-Im Bank also fails to satisfy the irreparable harm element as it is solely seeking money. It is axiomatic that "[m]onetary loss alone will generally not amount to irreparable harm." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). Thus, restraints will not issue "where the potential harm is strictly financial." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) (vacating injunction prohibiting foreign government from drawing on letter of credit). Here, Ex-Im Bank utterly fails to satisfy the irreparable harm element, as it seeks nothing more than to collect its judgment, *i.e.*, monetary damages. *See Valle v. YMCA of Greater New York*, No. 05CIV.5318(LTS)(FM), 2006 WL 1376935, at *2 (S.D.N.Y. May 17, 2006) (finding no irreparable harm because the harm allegedly inflicted on plaintiffs is "clearly compensable in money damages; indeed, Plaintiff's demands for more than $100 billion in compensatory and punitive damages effectively acknowledge as much.").

The cases cited by Ex-Im Bank in an attempt to circumvent this general principle do not change this result. These cases demonstrate only that where a party has gone to extraordinary lengths to hide assets or otherwise subvert a party's ability to collect a judgment, monetary damages may be an ineffective remedy. *See In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985); *see also NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 262 (2d Cir. 2012); *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996). But Ex-Im Bank has made no such showing that Niger, much less **Exelon**, has engaged in such extreme conduct. Instead, it merely argues that monetary damages are insufficient here because the payments from Exelon "***may be*** Ex-Im Bank's sole viable opportunity to collect" its judgment against Niger. (Mem. at 18 (emphasis added).)

Moreover, Ex-Im Bank's delay in seeking injunctive relief evidences "an absence of the kind of irreparable harm required to support" a TRO. *Citibank, N.A. v. CityTrust*, 756 F.2d 273,

14

276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."); *see also City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 172-73 (S.D.N.Y. 2010)(same). No later than January 19, 2015, by letter, Exelon informed Ex-Im Bank that Exelon received from SOPAMIN a shipment of uranium and Exelon was required to, and intended to, to make a timely payment. On January 21st, Ex-Im Bank informed Exelon that it intended to file the instant motion on January 26th. However, rather than seeking such immediate relief, Ex-Im Bank waited until one week before the payment was due in an attempt to manufacture an emergency – clearly hoping to game the system and interfere with Exelon's contract on the basis of a TRO, rather than a full-blown briefing or a motion for a preliminary injunction. Such delay clearly undermines Ex-Im Bank's argument that it faces imminent irreparable harm. *See Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 909-10 (S.D.N.Y. 1995).

      C.      **The Balance of the Equities Overwhelmingly Favor Exelon.**

As between Exelon and Ex-Im Bank, the balance of the equities undoubtedly favor Exelon. The issuance or continuance of a TRO against Exelon, a non-party in both the instant action and Niger Litigation, would require Exelon to fail to make its contractually required payment to SOPAMIN, something that could put Exelon's valuable and important contractual relationship at risk. Such interference with the private right to contract of a third party is indisputably inequitable. In contrast, if the TRO is not issued, Ex-Im Bank would be in the same position it is in now, *i.e.*, seeking to collect a judgment debt from a party with whom Exelon has no relationship. And Ex-Im Bank has not argued (nor could it in good faith) that this is the only mechanism through which it can collect its judgment against Niger. Instead, it contends that this

"***may be*** Ex-Im Bank's sole viable opportunity to collect" its judgment against Niger. (Mem. at 18 (emphasis added).)

### D. The Public Interest Would Be Promoted By Not Issuing A Restraint.

Continuing the TRO would undermine, rather than promote, the public interest. If the TRO is continued, Exelon would be barred from making a contractual payment to a third party. Thus, dissolving the TRO would promote the public interest "by protecting the freedom to contract through enforcement of contractual rights and obligations." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). In addition, as the Supreme Court has recognized, there is also a compelling public interest in recognizing the separateness of foreign sovereigns and their instrumentalities in order to ensure that foreign sovereigns do not "disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary." *Bancec*, 462 U.S. at 628.

## CONCLUSION

For the foregoing reasons, Exelon respectfully requests that this Court reject any request by Ex-Im Bank to issue a restraining notice on Exelon's payments to SOPAMIN and to dissolve the existing TRO and decline to extend the TRO restricting its payment to SOPAMIN.

Dated: February 10, 2015	Respectfully submitted,

**EXELON GENERATION COMPANY, LLC**

/s/  Todd B. Marcus
One of Its Attorneys

Todd B. Marcus
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5600
todd.marcus@sidley.com

Holly Harrison
Patrick Croke
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Exelon Generation Company, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY THAT**, on this 10th day of February 2015, I caused to be served on counsel of record in the above-captioned litigation via the ECF system and counsel for SOPAMIN via email a true and correct copy of Exelon Generation Company, LLC's Exelon Corporation's Memorandum In Opposition to Export-Import Bank's motion brought by an order to show cause for permission to serve a restraining notice and for a temporary Restraining Order.

/s/  Todd B. Marcus
    Todd B. Marcus