UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE EXPORT-IMPORT BANK OF THE
REPUBLIC OF CHINA,

                      Judgment Creditor,           97 Civ. 3090 (LAK)

        -against-

REPUBLIQUE DU NIGER,

                      Judgment Debtor,

          -and

LA SOCIETE DE PATRIMOINE DES
MINES DU NIGER,

                      Interested-Third-Party.
------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF VACATING A
TEMPORARY RESTRAINING ORDER AND IN SUPPORT OF
A  PROTECTIVE ORDER RESTRAINING EXECUTION EFFORTS**

MAVRONICOLAS & DEE LLP
415 Madison Avenue, 18th Floor
New York, New York 10017

*Counsel for La Societe de Partimoine des
Mines du Niger*

## TABLE OF CONTENTS

Pages

PRELIMINARY STATEMENT…………………………………………………… 1

STATEMENT OF FACTS……………………………………………………. 2

    A. The Parties……………………………………………………… 2

    B. The Underlying Transaction between Niger
       and Ex-Im Bank and Subsequent Judgment…………………………… 2

    C. The SOPAMIN/Exelon Transaction…………………………………. 3

    D. Ex-Im's Effort to Execute its Judgment
       Against Niger on SOPAMIN's Funds……………………………….. 3

    E. The Consequences of Ex-Im Bank's
       Interference with the Exelon Contract………………………………… 4

    F. SOPAMIN is an Independent Legal Business
       Entity Separate from the Government of Niger…………………………… 4

ARGUMENT……………………………………………………………….. 6

  I. SOPAMIN IS AN INSTRUMENTALITY OF A FOREIGN
    SOVEREIGN AFFORDED SOVEREIGN IMMUNITY
    UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT…………….…. 6

  II. THIS COURT LACKS PERSONAL JURISDICTION
    OVER SOPAMIN…………………………………………………… 7

  III. THIS COURT LACKS SUBJECT MATTER JURISDICTION
     OVER EX-IM BANK'S CLAIM AGAINST SOPAMIN…………………… 8

  IV. ENFORCEMENT MECHANISMS SHOULD BE PRECLUDED
     AS TO SOPAMIN'S ASSETS PURSUANT TO N.Y. CPLR §5240,
     BECAUSE SOPAMIN IS SEPARATE AND INDEPENDENT
     FROM THE JUDGMENT DEBTOR NIGER……………………….…… 12

     A. SOPAMIN is an Interested Party with Standing to Move
        Under N.Y. C.P.L.R…………………………………………………… 13

i

B.  SOPAMIN is a Separate Juridical Entity Entitled to Immunity……………  14

(i)  SOPAMIN is not controlled by Niger…………………………………  16

(ii) No fraud or injustice………………………………………………………  21

V.  THE FUNDS EX-IM BANK IS ATTEMPTING TO RESTRAIN
ARE NOT USED FOR COMMERCIAL PURPOSES IN THE
UNITED STATES………………………………………………………………  24

VI. EX-IM BANK CAN NOT ESTABLISH GROUNDS FOR
EITHER A TEMPORARY RESTRAINING ORDER OR
AN ATTACHMENT…………………………………………………………..  26

Irreparable Harm…………………………………………………………………  27

Likelihood of Success on the Merits………………………………………..  29

Balance of Hardships and Public Consequences of any Injunction……………  30

CONCLUSION…………………………………………………………………………  32

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Pages</u>

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428, 109 S. Ct. 683 (1989)……………………………………............   8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir.1999) ……………….................................................   8

*Byrd v. Corporacion Forestal Y Indus. De Olancho, S.A.*,
974 F. Supp. 2d 264 (S.D.N.Y. 2013)…………………………………………..   14,16,17,22

*CRP/Extell Parcel I, L.P. v. Cuomo,* 394 Fed. Appx. 779
(2d Cir N.Y. 2010)………………………………………………………………….   27

*De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984)………………………..   15,23

*Epperson v. Entm't Express, Inc.,* 242 F.3d 100 (2d Cir. 2001)……………………….   11,12

*Estate of Ungar v. Orascom Telecom Holding S.A.E.*,
578 F. Supp. 2d 536 (S.D.N.Y.2008)……………………………………………   10,12

*Export-Import Bank of the Republic of China v. Grenada et al,*
768 F.3d 75 (2d Cir, 2014)………………………………………………………   24,25

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438, 284 U.S. App. D.C. 333 (D.C. Cir. 1990)………………………….   15

*Futura Dev. of Puerto Rico, Inc. v. Estado Libre
 Asociado de Puerto Rico*, 144 F.3d 7 (1st Cir. 1998)…………………………….   10

*Geveke & Co. Int., Inc. v. Kompania Di Awa I Elektrisidat
 Di Korsou N.V.,* 482 F. Supp. 660 (S.D.N.Y. 1979)…………………………….   8

*Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411 (2d Cir. 2004)…………….   26

*Hashemite Kingdom of Jordan v. Layale Enters.
(In re B-727 Aircraft)*, 272 F.3d 264 (5th Cir. 2001)………………………………   8

*John Birch Soc'y v. National Broadcasting Co.,*
377 F.2d 194 (2d Cir. 1967)……………………………………………………...   8

*Kalamazoo Spice Extraction Co v. Provisional Military
Gov't of Socialist Ethiopia*, 616 F.Supp. 660 (W.D. Mich 1985)………………….   17

*Katzir's Floor & Home Design, Inc. v. M-MLS.com,*
  394 F.3d 1143 (9th Cir. 2004)……………………………………………………    22

*Knox v. Orascom Telecom Holding S.A.E.*, 242 F.R.D. 251
(S.D.N.Y. 2007)……………………………………………………………………    10

*Knox v. Orascom Telecom Holding S.A.E.,* 477 F. Supp. 2d 642
 (S.D.N.Y. 2007)……………………………………………………………………    10

*LNC Invs., Inc. v. Republic of Nicaragua*, 2000 U.S. Dist. LEXIS 7814
 (S.D.N.Y. 2000)…………………………………………………………………..    13

*Manway Constr. Co. v. Housing Auth.,* 711 F.2d 501 (2d Cir. 1983)……………    12

*McKesson Corp v. Islamic Republic of Iran,* 52 F.3d 346 (D.C. Cir 1995)……………    15

*Peacock v. Thomas,* 516 U.S. 349, 116 S. Ct. 862 (1996)……………………………    10,11

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999)………………………… …    27

*Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S. Ct. 1471 (1993)………………………..    9

*Sinochem Int'l Co. v. Malay Int'l Shipping Corp*.,
549 U.S. 422, 127 S. Ct. 1184 (2007)……………………………………………    7

*S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983)………………    26

*Sunward Elec., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004)…………………………    27

*Thai Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic,*
2013 U.S. Dist. LEXIS 110353 (S.D.N.Y. Aug. 2, 2013)…………………….......    23

*Tom Doherty Assocs. v. SabanEntm't, Inc.*, 60 F.3d 27 (2d Cir. 1995)………………..    27

*TransAmerica Leasing Inc v. La Republica de Venezuela,*
200 F.3d 843 (D.C. Cir.2000)……………………………………………….............    16, 17

*Universitas Education v. Nova Group, Inc.,* 2015 U.S. Dist. LEXIS 435……………..…    9

*Virtual Countries, Inc. v. Republic of S. Africa,*
300 F.3d 230 (2d Cir. 2002)……………………………………………………………    9

*Walters v. Industrial and Commercial Bank of China, Ltd.,*
651 F.3d 280 (2d Cir. 2011)……………………………………………………………    6,14

iv

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7
129 S. Ct. 172 (2008)……………………………………………………..  627, 31

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012)………………………………  26

**<u>Statutes</u>**

N.Y.C.P.L.R. § 5240……………………………………………..…………  1,12,13,14

Fed. R. Civ. P. 12(b)(1)…………………………………………………..  9

Fed. R. Civ. P. 12(h)(3)…………………………………………………..  8

Fed. R. Civ. P. 65……………………………………………………………  26

Fed. R. Civ. P. 69(a)(1)……………………………………………………  12

28 USC § 1330 (2015)……………………………………………………  8

28 USC § 1330(a) (2015)…………………………………………………  7

28 USC § 1330(b) (2015)…………………………………………………  7

28 USC § 1330(c) (2015)…………………………………………………  1,7

28 USC § 1602 *et seq.* (2015)….………………………………………  1,7

28 USC § 1603(a)…………………………………………………………..  2

28 USC § 1603(b)(1-3) (2015)…………………………………………  6

28 USC §1604……………………………………………………………  7

28 USC §§1605-1607…………………………………………………  8

28 USC §1608……………………………………………………………  8

28 USC § 1609 (2015)…………………………………………………  6

28 USC § 1610(a) (2015)…………………………………………………  24, 25

28 USC § 1610(d) (2015)……………………………………………..  3, 26

## PRELIMINARY STATEMENT

Interested -Third -Party La Societe De Patrimoine Des Mines Du Niger's "Memorandum of Law in Support of Vacating a Temporary Restraining Order and In Support of a Protective Order Restraining Execution Efforts" was initially prepared in anticipation of what it could only surmise to be the manner in which Export-Import Bank of the Republic of China ("Ex-Im Bank") intended to proceed before this Honorable Court on February 9, 2015 by way of Order to Show Cause. On February 9, 2015 Ex-Im Bank finally served its papers in support of its Order to Show Cause on counsel for La Societe De Patrimoine Des Mines Du Niger ("SOPAMIN"). These papers included the Declaration of Andrew T. Soloman (Soloman Decl.) and "The Export –Import Bank of the Republic of China's Memorandum of Law in Support of its Motion brought by Order To Show Cause For Permission to Serve A Restraining Notice And For A Temporary Restraining Order" ("Ex-Im Memo")  SOPAMIN's Memorandum of Law is now also submitted in response  to Ex-Im Bank's papers.

SOPAMIN now answers that the temporary restraining order issued ex-parte, without the Court hearing counsel in opposition to Ex-Im Bank's Order to Show Cause for the issuance of a temporary restraining order, should be vacated on the grounds, inter alia, that the funds at issue are the exclusive property of SOPAMIN, which is an instrumentality of the government of Niger afforded sovereign immunity both for itself and its property under the Foreign Sovereign Immunity Act 28 USC § 1602 et. seq. (2015) and allowed to defend its sovereignty before this Honorable Court pursuant to 28 USC § 1330(c) without conferring personal jurisdiction. SOPAMIN further submits in its Answer that the Court lacks both personal and subject matter jurisdiction  over SOPAMIN and its property, that the Court should pursuant to N.Y. CPLR § 5240 preclude any enforcement of Ex-Im Bank's Judgment on SOPAMIN property, by

restraining notice or otherwise because SOPAMIN is separate and independent from the Judgment Debtor Niger.  The funds now restrained are not used for commercial purposes in the United States and Ex-Im Bank has not established grounds necessary for the issuance of a temporary restraining order.

## STATEMENT OF FACTS

The facts relevant to the instant matter are fully set forth in the Declarations of Hamma Hamadou ("*Hamadou Decl."),* Ibrahim Moussa-Gros ("*Moussa Decl."*) and the Declaration of Robert Follie ("*Follie Decl.*") filed herein. A brief recapitulation of the most salient of those relevant facts follows.

### A.      The Parties

The Interested-Third-Party in these proceedings, SOPAMIN, is a company organized and existing under the laws of the nation of Niger and the OHADA Pan-African Treaty Convention to which Niger is a party. *Hamadou Decl.*¶ 4 The majority shareholder of SOPAMIN is the government of Niger. Id.  It is a matter of public knowledge to which the Court may take judicial notice that SOPAMIN is an instrumentality of the government of Niger. *Mavro Decl.* ¶ 3[1] In addition the attorney's that have examined SOPAMIN's creation have confirmed that SOPAMIN is a state created and business entity. *Follie Decl* ¶ 47 The Plaintiff and Judgment Creditor in these proceedings is The Export-Import Bank of the Republic of China ("Ex-Im Bank"). Ex-Im Bank is more than fifty percent owned by the Republic of China. *Kai-Kuo Decl.* ¶ 10[2]

### B.      The Underlying Transaction between Niger and Ex-Im Bank and Subsequent Judgment

---

[1] Attorney Declaration of Anthony Mavronicolas filed herein
[2] Declaration of Nieh Kai-Kuo previously filed in these proceedings in 1998 (attached)

[3] As § 1603(a) of the FSIA makes clear, an "agency or instrumentality of a foreign state as elaborated in subsection (b) Declaration of Nieh Kai-Kuo previously filed in these proceedings of the FSIA in 1998 (attached)
[4] Further, the grant of jurisdiction found in 28 U.S.C. § 1330 (2015) confers jurisdiction only over "any claim for

2

This matter arises out of an alleged development loan given by Ex-Im Bank to the nation of Niger. Ex-Im Bank commenced proceedings against Niger before this Honorable Court alleging default by Niger and obtained a judgment of $72,666,003.40 against Niger in 1998. The most recent activity in these proceedings is an effort by Ex-Im Bank to execute its 1998 judgment against Niger on funds belonging to SOPAMIN now held by Exelon Generation Company LLC ("Exelon").

### C.      The SOPAMIN/Exelon Transaction

SOPAMIN as the seller of uranium concentrates and Exelon as a utility company that operates nuclear reactors generating electricity throughout the United States entered into a May 24, 2010 contract for the sale and delivery over a term of years. *Hamadou Decl.* Exh.10 In January of 2015, SOPAMIN delivered uranium concentrates to Exelon under that May 24th contract of sale for which Exelon is obligated under the terms of that sales contract to make payment to SOPAMIN within thirty days of delivery. Id. The government of Niger had no role in the negotiation or execution of this May 24th contract. *Hamadou Decl.* 11  Concomitantly, Niger has no interest in these funds to be paid by Exelon to SOPAMIN. Id.

### D.      Ex-Im's Effort to Execute its Judgment
###         Against Niger on SOPAMIN'S Funds

SOPAMIN has learned that Ex-Im Bank in aid of execution of its judgment against the government of Niger has obtained discovery of Exelon documents and taken the deposition of Exelon regarding the May 24, 2010 sales contract between Exelon and SOPAMIN. SOPAMIN has also learned that counsel for Exelon and Ex-Im Bank have entered into a Stipulation that required Exelon's attorney to provide Ex-Im Bank's attorneys with twenty-five days notice prior to making any payment to SOPAMIN under that sales contract. Such notice has been given and under the terms of the sales contract Exelon is required to make payment no later than on and

around February 15th. *Mavro Decl.* ¶4-5  Ex-Im Bank now moved before this Honorable Court

on February 9th for a Temporary Restraining Order barring Exelon from making payment to

SOPAMIN. *Mavro Decl.* ¶4 Without hearing the parties in opposition to Ex-Im Bank's Order to

Show Cause who were prepared to argue on the morning of February 9th, Judge Kaplan granted a

temporary restraining order pending a hearing before the Honorable Andrew L. Carter.

     E.    **The Consequences of Ex-Im Bank's**
                 **Interference with the Exelon Contract**

SOPAMIN has structured the sale to Exelon under the May 24, 2010 contract of sale as a

back-to-back transaction. *Moussa Decl.* ¶6 The terms of the sales contract to Exelon require

SOPAMIN to first deliver the uranium concentrates to Exelon and then for Exelon to make

payment within thirty days of each delivery under the sales contract. *Moussa Decl.* Exh.1 In turn,

SOPAMIN's purchase of the uranium from the mining companies in Niger requires SOPAMIN

to make payment to those companies within thirty days of delivery to Exelon. *Moussa Decl.* ¶ 6

By restraining the payment of the funds now owed to SOPAMIN by Exelon for this January

delivery, Ex-Im Bank is preventing SOPAMIN from making payment to the mining companies

in Niger.  *Moussa Decl.* ¶ 7  This default by SOPAMIN with the mining companies denies these

funds to the mining companies which need these funds for their mining operations Id. Those

mining companies, principal employers in Niger, located in a region bordering Algeria and Mali,

now subject to economic disruption as a result of Ex-Im Bank's wrongful interference, may

result in political instability in a region already subject to terrorist activity. Id.

     F.    **SOPAMIN is an Independent Legal Business**
                 **Entity Separate from the Government of Niger**

It is indisputable that SOPAMIN was created in 2007 under the laws of Niger and the

Pan-African commercial treaty of OHADA. *Hamadou Decl.* ¶ 4 The majority shareholder of

SOPAMIN is the government of Niger. Id. SOPAMIN has a formal business structure that includes:  Board of Directors with an elected Chairperson, a Director General elected by the board to manage SOPAMIN, SOPAMIN employees with employment contracts covering benefits and tax records kept in the ordinary course of business. *Hamadou Decl.* ¶ 5,7,8 As a limited commercial company under OHADA and the laws of Niger SOPAMIN has the rights of business entities such as property rights and legal capacity.  *Hamadou Decl.* ¶ 12  Like any other business entity in Niger, SOPAMIN must compete for business which in the past it has lost to other companies. *Hamadou Decl.* ¶ 10

SOPAMIN is treated by the government of Niger like any another business entity organized and existing under the laws of Niger. *Hamado Decl.* ¶ 8 SOPAMIN pays taxes to the government tax authorities, is subject to tax audits by those authorities and has paid assessed taxes, interest and penalties as a result of those audits. Id. As any business entity, SOPAMIN maintains liability and employee health insurance policies. *Hamadou Decl.*¶ 10

The government of Niger does not control and has not interfered in the business operations of SOPAMIN. *Hamadou Decl.* ¶ 10, 12 Since its creation in 2007, SOPAMIN has remained free of any interference in its business from the government of Niger. *Hamadou Decl.* ¶10 The only funds the government of Niger has ever received from SOPAMIN have been in the form of taxes and dividends in the years dividends have been distributed to SOPAMIN's shareholders. Id.

Counsel familiar with the laws of Niger, as well as the French legal system which Niger as former French colony modeled its legal system on, has examined the relevant law, the creation and structure of SOPAMIN, as well as SOPAMIN's operations to date and concluded that SOPAMIN is a commercial entity independent from and legally separate from the government of

Niger which created it. *Follie Decl.* ¶ 47  In conducting such a thorough examination of both the structure and operations of SOPAMIN in the context of the laws of Niger as well as the OHADA treaty, M. Follie has surpassed the limited criteria offered this Honorable Court in 1998 by Ex-Im Bank to establish that Ex-Im Bank was an independent instrumentality of the Republic of China.  *Kai-Kuo Decl.* ¶ 10

## ARGUMENT

### I.    SOPAMIN IS AN INSTRUMENTALITY OF A FOREIGN SOVEREIGN AFFORDED SOVEREIGN IMMUNITY UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

SOPAMIN was created and exists under the laws of Niger and the Pan African treaty convention OHADA. *Hamadou Decl.*  ¶4 The majority shareholder of SOPAMIN is the government of Niger. Id As such, under the Foreign Sovereign Immunities Act ("FSIA") SOPAMIN is an instrumentality of a foreign sovereign. 28 USC § 1603(b)(1-3) (2015) And as an instrumentality of a foreign sovereign, any property of SOPAMIN in the United States is immune from execution but for certain limited exceptions provided for under the FSIA. 28 USC § 1609 (2015)  Here Ex-Im Bank intends to restrain funds that are the property of SOPAMIN in the custody and control of Exelon in an effort to execute on a judgment Ex-Im Bank has against the government of Niger. It is, however, well settled in this Circuit that the instrumentalities of foreign sovereigns are to be considered separate legal entities.   *Walters v. Industrial and Commercial Bank of China, Ltd.*, 651 F.3d 280, 298 (2d Cir. 2011) Ex-Im Bank attempts to restrain the property of an interested-third-party, rather than the property of its judgment debtor Niger, and in doing so has restrained property of a sovereign's instrumentality that is immune from execution in any event.

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER SOPAMIN

Because of the primacy of jurisdiction, "jurisdictional questions ordinarily must precede merits determinations in dispositional order." *Sinochem Int'l Co. v. Malay Int'l Shipping Corp*., 549 U.S. 422, 431, 127 S. Ct. 1184, 1191 (2007).  SOPAMIN appears herein to defend its interests in the property at issue while preserving and asserting its defense based on lack of personal jurisdiction. *See* 28 U.S.C. § 1330(c)(2015).

The FSIA, 28 U.S.C. § 1602 *et seq*., provides the sole basis for obtaining jurisdiction over a foreign state, including its agencies or instrumentalities.[3] *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 443, 109 S. Ct. 683, 693 (1989). Section 1604 provides that "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of this Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604. Section 1330(a) of Title 28 provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a)(2015).

FSIA Section 1604 and Section1330(a) of Title 28 work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity."*Argentine Republic*, 488 U.S. at 434, 109 S. Ct. at 688.  Under Section 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist

---

[3] As § 1603(a) of the FSIA makes clear, an "agency or instrumentality of a foreign state as elaborated in subsection (b)" itself is treated as a foreign state for the purposes of the FSIA.

as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under [28 U. S. C. § 1608]."  "Thus, personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-1607 applies". *Argentine Republic*, 488 U.S. at 435, 109 S. Ct. at 688, n.3.

Here, Ex-Im Bank asserts no grounds under FSIA §§ 1605-1607 pursuant to which this Court may exercise jurisdiction over SOPAMIN.   Ex-Im Bank's would certainly be unable to claim a SOPAMIN waiver of immunity by Niger in loan documents apparently executed well over a decade before SOPAMIN was even formed. Cleary, the claim that  Ex-Im Bank  makes purporting to suggest extensive control and day-to day involvement by Niger over SOPAMIN, which will be discussed in detail below, are conclusory allegations failing to rebut SOPAMIN's presumption of immunity.[4]

## III.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER EX-IM BANK'S CLAIM AGAINST SOPAMIN

Because the federal courts are of limited jurisdiction, this Court may, at any stage of the proceedings, raise the question of subject matter jurisdiction and dismiss pending litigation if such jurisdiction is found to be lacking. Fed. R. Civ. P. 12(h)(3); *see also John Birch Soc'y v. National Broadcasting Co.,* 377 F.2d 194, 199 (2d Cir. 1967).

---

[4] Further, the grant of jurisdiction found in 28 U.S.C. § 1330 (2015) confers jurisdiction only over "any claim for relief in personam" that is against a foreign state and for which an FSIA exception applies -- not over in rem actions. *See Hashemite Kingdom of Jordan v. Layale Enters. (In re B-727 Aircraft)*, 272 F.3d 264, 270 (5th Cir. 2001). Consistent with this limited grant of jurisdiction, "[t]he FSIA provides that the property of foreign states used for commercial activities in the United States is generally immune from prejudgment attachment." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir.1999) (*citing* 28 U.S.C. § 1610(d)).  "The reason for this limitation is to prevent the location of the property from conferring jurisdiction on the court -- i.e., to prevent in rem and quasi-in-rem actions from undermining the general principles codified in the FSIA."  *Id.* (*citing Geveke& Co. Int., Inc. v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660, 663 (S.D.N.Y. 1979)).  In any event, Ex-Im Bank identifies no assets of SOPAMIN within this Court's jurisdiction, thus precluding the exercise of *quasi in rem* jurisdiction by this Court although in effect it does so by restraining a debt due from Exelon present In the jurisdiction.

As set forth above, under the FSIA: "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476 (1993). There is no dispute here that SOPAMIN, as an instrumentality of Niger, is a foreign sovereign under the FSIA.  The burden thus rests with Ex-Im Bank to present evidence establishing that, under exceptions to the FSIA, immunity should not be granted. *See, Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (affirming the district court's dismissal of declaratory action against a foreign sovereign for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)).  "Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and -- if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue -- resolution of disputed issues of fact." *Id.* (internal quotation and citation omitted).  Only where the plaintiff satisfies its burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply. *Id.*

Though Ex-Im Bank fails to present any non-conclusory evidence to support its assertion that SOPAMIN should be liable for the debts of Niger (as set forth below), the Court need not address this burden-shifting framework, for it lacks ancillary jurisdiction over Ex-Im's instant application.

Here, as in *Universitas Education v. Nova Group, Inc.*, "[t]he pending order to show cause and motions, having been initiated in these cases after judgment was entered and in connection with collection efforts, invoke the court's ancillary jurisdiction. The principal question before the Court is whether such ancillary judgment enforcement jurisdiction extends to

the determination of disputes as to whether particular property belongs to the judgment debtor and, if such jurisdiction exists, whether the Court will exercise that jurisdiction."   2015 U.S. Dist. LEXIS 435 (attached)

As Ex-Im Bank must be aware, the disposition of that issue will require an alter-ego, or veil-piercing determination, which Ex-Im Bank unsuccessfully embarked on in seeking discovery from Exelon. *Mavro Decl.*¶ 6 Although Ex-Im Bank may baldly contend that the beneficiary of the Exelon contract is Niger, it must nonetheless acknowledge that the funds/debt owed under that contract is the property of SOPAMIN, not Niger's.  *Hamadou Decl.* Exh. 10 That the Exelon payment is due to SOPAMIN, not Niger, is evidenced by the very documents Ex-Im Bank obtained from Exelon during that discovery effort. *Mavro Decl.* Exh. B

Ex-Im Bank's allegations inescapably require this Court to engage in an analysis for which it lacks an independent basis of federal jurisdiction. *See Knox v. Orascom Telecom Holding S.A.E.*, 242 F.R.D. 251, 253-54 (S.D.N.Y. 2007); *Knox v. Orascom Telecom Holding S.A.E.,* 477 F. Supp. 2d 642, 646-49 (S.D.N.Y. 2007); *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536, 548-51 (S.D.N.Y.2008) (holding that exercise of ancillary enforcement jurisdiction inappropriate where determination sought is in the nature of alter-ego theory as: "Plaintiffs' assertions would require this Court to 'treat the corporate form of [PIF] as a complete nullity--to look through its legal identity to the party standing behind it--and to do so under the guise of making a factual determination necessary to determine [this Court's] subject matter jurisdiction over this case.'") (quoting *Futura Dev. of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7, 12 (1st Cir. 1998); *Universitas* (same)

In *Knox*, 477 F. Supp. 2d 642, relying on the U.S. Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996), Judge Marrero held that the Court lacked

ancillary jurisdiction because that action raised alter-ego or veil-piercing claims that were not before the judgment court and thus required an independent basis for federal question jurisdiction. See *Knox*, 477 F. Supp. 2d at 647 ("As Orascom correctly points out, once the Court is required to engage in a veil-piercing or alter ego analysis as to this question, an independent basis for jurisdiction is required") (citing *Epperson v. Entm't Express, Inc*., 242 F.3d 100, 106 (2d Cir. 2001) (analyzing *Peacock*)).

In *Peacock*, the plaintiff prevailed in an ERISA claim against his employer, a corporation, in district court, and then sought to rely on the ERISA statute as the basis for ancillary jurisdiction in a second suit seeking to pierce the corporate veil between the corporation and its officer and shareholder. The Supreme Court concluded, however, that the plaintiff's "veil-piercing claim does not state a cause of action under ERISA and cannot independently support federal jurisdiction." *Peacock*, 516 U.S. at 353-54, 116 S. Ct. at 866. The plaintiff's attempt to extend liability for payment of the ERISA judgment from the corporation to its officer and shareholder under a veil-piercing theory did not fall within the district court's ancillary enforcement jurisdiction  *Peacock*, 516 U.S. at 359, 116 S. Ct. at 869.

Likewise here, Ex-Im Bank seeks the funds owed to SOPAMIN from Exelon, on grounds that did not exist at the time of the entry of the Ex-Im Bank judgment against Niger. Specifically, Ex-Im Bank now seeks a restraining order apparently claiming that the assets Exelon owes to SOPAMIN can be used to satisfy Ex-Im Bank's judgment against Niger under a theory that the assets at issue belong to Niger.

Such alter-ego allegations cannot state a claim under the Niger loan contracts underlying the Niger judgment and, therefore, cannot independently support federal question jurisdiction. See *Peacock*, 516 U.S. at 353-54, 116 S. Ct. at 866. Thus, the instant application against Exelon

11

is not "ancillary to the judgment in the former suit," but rather is "entirely new and original," and seeks "relief . . . of a different kind or on a different principle than that of the prior decree." *Id*. at 516 U.S. at 358, 116 S. Ct. at 868 (internal quotations and citations omitted); see also *id*. at 516 U.S. at 357, 116 S. Ct. at 868 ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."); *Epperson*, 242 F.3d at 104 (recognizing that "an action to establish liability on the part of a third party . . . must have its own source of federal jurisdiction") See *Manway Constr. Co. v. Housing Auth.,* 711 F.2d 501, 505 (2d Cir. 1983)

Similarly, Ex-Im Bank cannot ground subject matter jurisdiction on the bare allegation that SOPAMIN merely receives the Exelon payment as a trustee or placeholder for Niger. See, *Estate of Ungar,* 578 F. Supp 2d at 536

Ex-Im Bank's basis for asserting subject matter jurisdiction here is actually a legal conclusion (*i.e.* disregard SOPAMIN's separate juridical status) couched as a factual allegation. The relief requested necessarily calls upon this Court to disregard SOPAMIN's corporate form and ultimately seeks to execute on the Exelon contract payment to SOPAMIN to satisfy Ex-Im Bank's judgment against Niger. As such, subject matter jurisdiction is lacking.

## IV. ENFORCEMENT MECHANISMS SHOULD BE PRECLUDED AS TO SOPAMIN'S ASSETS PURSUANT TO N.Y. C.P.L.R. § 5240, BECAUSE SOPAMIN IS SEPARATE AND INDEPENDENT FROM THE JUDGMENT DEBTOR NIGER

Pursuant to Fed.R. Civ. P. 69(a)(1), enforcement proceedings concerning money judgments are to be conducted in "accord with the procedure of the state where the court is located[.]" Here, SOPAMIN as an interested-third-party invokes the procedures of New York State enforcement to prevent severe consequences to its operations by seeking a protective order to preclude any attempt by Ex-Im Bank to enforce its judgment against Niger, including by

restraint of property in which SOPAMIN maintains an interest, pursuant to N.Y.C.P.L.R. § 5240.

In accord with New York State procedures governing judgment enforcement, such execution

efforts are subject to challenge and may be vacated or modified upon an appropriate motion

made by "any interested party[.]" *See* N.Y.C.P.L.R. § 5240 ("The court may at any time, on its

own initiative or the motion of any interested person, and upon such notice as it may require,

make an order denying, limiting, conditioning, regulating, extending or modifying the use of any

enforcement procedure. . .")

**A.    SOPAMIN is an Interested Party with Standing to Move Under N.Y. C.P.L.R.**

Pursuant to N.Y. C.P.L.R § 5240, SOPAMIN has standing to preclude the use of

enforcement mechanisms against SOPAMIN and SOPAMIN's property. In *LNC Invs., Inc. v.

Republic of Nicaragua*, 2000 U.S. Dist. LEXIS 7814 (S.D.N.Y. 2000), a motion to vacate a

restraining notice was made, pursuant to N.Y.C.P.L.R. § 5240, jointly by a judgment debtor and

restrained entities as "interested third parties".   Here, SOPAMIN is clearly an interested party

with respect to Ex-Im Bank's use of enforcement mechanisms where the property in the form of

funds belongs to SOPAMIN.

These funds are required by SOPAMIN to pay its mining company suppliers in Niger, the

interference with which threatens to destabilize the security, operation and maintenance of

essential aspects of Niger's mining infrastructure.   *Moussa Decl.* ¶ 7   Both the current, and

threat of future enforcement efforts preventing the payments from being made by Exelon the

buyer, to SOPAMIN the seller, may well destroy SOPAMIN as a marketer of uranium

concentrates.  *Moussa Decl.* ¶ 5 A restraining order would prevent SOPAMIN from paying the

mining companies in Niger from which SOPAMIN purchased the uranium from for this back-to-

back transaction. *Moussa Decl.*  ¶ 6 SOPAMIN, therefore, has the requisite interest, under

13

N.Y.C.P.L.R. § 5240, to move for limitation of Ex-Im Bank's use of enforcement procedures, including restraining orders, in connection with the Ex-Im Bank's judgment against Niger, on property in which SOPAMIN maintains an interest and not the judgment debtor Niger.

**B.      SOPAMIN is a Separate Juridical Entity Entitled to Immunity**

In the case underlying this motion, the Court found that Niger waived its immunity from suits arising out of the alleged development loans on which it was found to have defaulted. However, SOPAMIN is a juridical entity separate from Niger. *Follie Decl.* ¶ 47

"Under the FSIA, agencies and instrumentalities of a foreign nation 'established as juridical entities distinct and independent from their sovereign should normally be treated as such.'" *Byrd v. Corporacion Forestal Y Indus. De Olancho, S.A.*, 974 F. Supp. 2d 264, 269-270 (S.D.N.Y. 2013) (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627, 103 S. Ct. 2591, 77 L. Ed. 2d 46 (1983) ("*Bancec*")). As such, there is a "presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status" will be honored.  *Walters v. Industrial and Commercial Bank of China, Ltd.*, 651 F.3d 280, 298 (2d Cir. 2011) (*quoting Bancec* at 628).   The Second Circuit "recognize[s] a further presumption that assets of a foreign government instrumentality [can]not be executed upon to satisfy a judgment against a parent foreign government, which can be overcome only if the party seeking attachment carrie[s] its burden of demonstrating that the instrumentality's separate juridical status [i]s not entitled to recognition." *Walters*, 651 F.3d at 298 (internal quotations and citations omitted).  Ex-Im Bank has failed to carry that burden to allow it to execute its judgment against the judgment debtor Niger on the property of Niger's instrumentality SOPAMIN which has separate legal status from Niger.

In an attempt to carry that burden, Ex-Im Bank first claims that because the various

ministries of Niger appoint the directors of SOPAMIN's Board of Directors and the government of Niger is SOPMAIN's majority shareholder, SOPAMIN's separate juridical identity should be disregard. Ex-Im Memo, p10

However, under *Bancec*, "[i]t is not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality; in other words, mere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for the purposes of FSIA." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440, 284 U.S. App. D.C. 333 (D.C. Cir. 1990). Rather, to overcome the presumption of separateness, a creditor must show either that (i) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or, relatedly, (ii) "where recognition of the instrumentality as an entity apart from the state would work fraud or injustice." *Bancec* 462 U.S. at 629 (citations omitted). The Second Circuit recognizes that "both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness." *De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984).

Similarly, Ex-Im Banks offering the Court extracts from the SOPAMIN website to demonstrate that one of SOPAMIN's purpose was to manage mining operations in Niger in which the government may acquire interest fails to even approach the *Bancee* requirement. Ex-Im Memo, p11 The Supreme Court in *Bancec* explained that the instrumentality of a sovereign needed to be "so extensively controlled" to warrant that its separateness be disregarded as Ex-Im Bank seeks here. However, Ex-Im Bank's reading of *Bancec* and its progeny would require instrumentalities of sovereign nations to avoid the very purposes developing nations create them

if they are to remain independent. Both the evidence now before this court in the form of sworn declarations and supporting document and the guidance of *Bancec* and its progeny which even Ex-Im Bank relies on lead to contrary result

    (i) <u>SOPAMIN is not controlled by Niger.</u>

"In conducting the 'extensive control' test, courts examine whether the sovereign's level of involvement in 'day to day' operations exceeds the normal supervisory control exercised by a corporate parent over a subsidiary, or whether the sovereign and the instrumentality were 'operated as a single enterprise.'" *Byrd v. Corporacion Forestal Y Indus. De Olancho, S.A*., 974 F. Supp. 2d 264, 270 (S.D.N.Y. 2013) (citing*Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 848-49 (D.C. Cir. 2000). The Supreme Court in *Bancec* described the features of a typical government instrumentality:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply. 462 U.S. at 624.

    The Supreme Court further explained that these features "prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments' because they 'permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is

generally enjoyed by government agencies." *Byrd,* 974 F. Supp. 2d at 270 (quoting *Bancec*, 462 U.S. at 624-25).

Ex-Im Bank's reliance on *McKesson Corp v. Islamic Republic of Iran,* 52 F.3d 346 (D.C. Cir 1995) and *Kalamazoo Spice Extraction Co v. Provisional Military Gov't of Socialist Ethiopia*, 616 F.Supp 660 (W.D. Mich 1985) is misplaced. Ex-Im Memo, p10 Both cases have been distinguish in this District in light of extensive government intervention found in those cases and absent here.[5] Similarly, the DC Circuit itself in distinguished *Kalamazoo* from a latter case before it in light of the day-to-day involvement and extensive control absent in the case before it and in the fact before this Court. *TransAmerica Leasing Inc v. La Republica de Venezuela,* 200 F.3d843,852-853(D.C. Cir2000).

Here, the declarations of Messrs. Hamma Hammadou and Ibrahim Moussa-Gros, describe the structure and purpose of SOPAMIN, its long-term contract to supply Exelon with uranium concentrates, and how it must use the funds to pay the mining companies in Niger that supply the uranium to SOPAMIN. *Moussa Decl.* ¶ 6 In doing so, the undisputed evidence establishes that SOPAMIN is a "typical government instrumentality" in form, function and

---

"In the view of the court, this does not constitute the type of control which makes ENARSA an alter ego of the Republic, and liable for the Republic's debts. The ENARSA situation is different from what this court dealt with when it held that the central bank of Argentina was an alter ego of the Republic  for the purpose of allowing plaintiffs in certain cases to recover against funds deposited by the central bank in the Federal Reserve Bank of New York. EM Ltd. v. Republic of Arg., 720 F. Supp. 2d 273 (S.D.N.Y. 2010).  Also, the court has reviewed other cases where instrumentalities of foreign countries have in fact been held to be alter egos of the governments of those countries. In each of those cases, the foreign government intervened in the affairs of the instrumentality, sometimes with a deceptive purpose, to a degree more extreme than what is shown with regards to ENARSA. See, e.g., (citation omitted) **McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 351-52, 311 U.S. App. D.C. 197 (D.C. Cir. 1995); Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 616 F. Supp. 660, 666 (W.D. Mich. 1985).** A word must be said about the claim that ENARSA should be held liable under that branch of Bancec which states that the presumption of separateness of an instrumentality may be overcome when recognizing the corporate entity as independent would work a "fraud or injustice" against the government's creditors. 462 U.S. at 630; Letelier, 748 F.2d at 794-95.   It is surely true that the Republic has failed to pay its just bond debts and its just judgment debts, and this is, in the view of the court, serious wrongdoing. But, there is no basis whatsoever for any claim that ENARSA has been used to further this objective."
*NML Capital Ltd v. Republic of Arg, 2011 US Dist LEXIS 14795, 14-21 (SDNY, 2/15/2011)(aff'd* 892 F. Supp. 2d 530; 2012 U.S. Dist. LEXIS 123933 (2d Cir. 2012)

genesis. For example, SOPAMIN was "created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law." *Bancec*, 462 U.S. at 624. *Hamadou Decl*. ¶ 4.  It is also a "separate juridical entity, with the powers to hold and sell property and to sue and be sued."  *Bancec*, 462 U.S. at 624. *Hamadou Decl*. ¶ 12 SOPAMIN carries its own insurance policies covering the health care of its employees and company liability. *Hamadou Decl*. ¶ 10. SOPAMIN is also "primarily responsible for its own finances." *Bancec*, 462 U.S. at 624. *Hamadou Decl*. ¶ 12. SOPAMIN is "run as a distinct economic enterprise" with separate budgets and personnel, and possesses independent powers to internally hire and fire its employees, none of whom are civil servants.  *Bancec*, 462 U.S. at 624.  *Hamadou Decl*. ¶ 7, 8 And as a private company SOPAMIN must compete for business in Niger, losing out at times to other private companies in that market. *Hamadou Decl*. ¶ 10.  Day-to-day operational control of SOPAMIN is vested in and exercised by SOPAMIN and its officers, who operate without interference from the government. *Hamadou Decl*. ¶ 12

In light of these facts, and examining SOPAMIN's legal structure and operations, counsel qualified under French law and the law of Niger, reviewing SOPAMIN's legal structure has concluded that SOPAMIN is a separate legal entity created by Niger. *Follie Decl*.¶ 47

In the face of this overwhelming evidence, Ex-Im Bank offers the Court selected extracts from International Monetary Fund reports to again try and satisfy the "extensive control" and "involvement in day-to day operations" requirement of *Bancee*. Ex-Im Memo, p 11 Ex-Im Bank points to the fact that because, Niger, as a shareholder of SOPAMIN is entitled to receive dividends it somehow runs afoul of the *Bancec* requirements for disregarding an instrumentalities juridical standing. On the contrary, like any other business entity SOPAMIN

pays taxes to the state and the state as a shareholder of the company receives dividends. . *Hamadou Decl*. ¶ 7, 8,10,12

Ex-Im Bank relying on its IMF extracts to now claim SOPAMIN's budget "appears to be controlled" by Niger is simply misleading, Ex-Im Memo, p11 The very paragraph from which the extract is taken begins: The government reaffirms its commitments to ensure transparent management of its mining and petroleum resources-a prerequisite if such resources are to be used optimally." Solomon Decl Exh U, p34 So to assure its lender the IMF of Niger's transparency in handling its interests in these resources, Niger has all of its instrumentalities, not just SOPAMIN as the extract suggests, provide certified accounts to Niger's legislature with the national draft budget-not the instrumentalities budgets for "control". And in so doing, the IMF obviously also benefits from the transparency which that public record provides in being assured that the instrumentalities that provide dividends and taxes to the state are open to scrutiny.

Ex-Im Bank's reliance on the IMF extract that starting in 2013 SOPAMIN would be financed with an unidentified budget allocation again runs afoul of the guidance offered by the Supreme Court in *Bancec*. Ex-Im Memo p12  There the court explicitly recognized that a "typical instrumentality" could well receive appropriations to provide capital or cover losses from its sovereign.  *Bancec* 462 U.S. at 624.  Memo p12  Further, nothing in that extract establishes that the budget allocation being described is Niger's to SOPAMIN, rather than SOPAMIN's itself. And most telling, the person who has been on SOPAMIN's Board of Directors since its inception has sworn that SOPAMIN has never received any allocated funds from the government of Niger when directed to this IMF extract. *Hamadou Decl*. ¶ 14 In point of fact this Director was charged with cooperating with the IMF Niger Unit and in reviewing the exhibits from which these extracts were drawn explains how the IMF documents document

SOPAMIN's independence, not control by Niger or the involvement of Niger in the day-to-day affairs of SOPAMIN. Id.

Similarly, Ex-Im Banks claim that SOPAMIN' dealings with Exelon demonstrate the "extensive control" and "involvement in day-to-day operations" is simply unfounded. Ex-Im Bank, 12  The Court has before it sworn statements of the Chief Trader for SOPAMIN and a director of the company and former Director General of company that Niger had no role in the negotiation or performance of the Exelon contract, nor does Niger have any interest in the funds Exelon is to pay SOPAMIN under the contract. *Hamadou Decl.* ¶11, *Moussa Decl.* ¶ 2 Single meetings with politicians in Niger, without any participation in the negotiations between SOPAMIN and Exelon shows interest in the economic activities in their nation, not control or involvement in day-to-day operations.  Similarly, a single letter head at the inception of SOPAMIN and the location of its offices at the time, which even the SOPAMIN website relied upon by EX-Im Bank shows SOPAMIN's location in its own building, clearly fail to establish either extensive control or day-to-day involvement. More importantly, Ex-Im Bank's discovery of Exelon revealed just the opposite-that Niger had no roll in SOPAMIN's dealings with Exelon as Ex-Im Bank now claims. *Mavro Decl* ¶ 6 In point of fact, neither the evidence adduced in Exelon's deposition and documents produced by Exelon for Ex-Im Bank demonstrates anything near the extensive control of day-to-day involvement required for the court to disregard the presumption of separateness and sovereign immunity SOPAMIN is entitle to. Id.

Ex-Im Bank's effort to avoid the weight of evidence before this Court that establishes that SOAPMIN is indeed an independent instrumentality neither extensively control or subject to day-to-day control by Niger by arguing that cited New York authority allow Ex-Im Bank  to only make a prima facie showing that a corporate veil should be pierced is wrong on both facts and

law. Ex-Im Memo, p14-15 On the facts alone *Thompson v. Pollack* 873 N.Y.S.2d 859, 864 (NY Sup., 2009) is clearly distinguishable where the restrained party had dissolved a corporate judgment debtor years before but continued to use the dissolved corporate name and its still existing account for personal expenses, and in *Plaza Hotel Associates v. Wellington Associates Inc.,* 378 N.Y.S. 2d 859, 864 (NY Sup., (1975)) with the party seeking the retraining notice having proven that the restrained entity and the judgment debtor being one and the same except as to entity form distinguishing that case from the record before this Court. However, neither of these cases Ex-Im Bank cites in support of its argument that it need only make a prima facie showing to restrain Exelon and SOPAMI required the court to consider the FSIA and sovereign immunity issues before this Court.  Ex-Im Memo, p.15  On the FSIA issues for this argument that it need only make a prima facie showing to restrain an instrumentality of a nation, Ex-Im Bank offers this Court *Palistine Monetary Authority v. Strachman*, 62 A.D. 3d 213 (1st Dept, 2009) and *EM Ltd. v. Republic of Argentina* 389 Fed. App'x 38 (2nd Cir. 2010) In *Palistine* the New York Court explicitly found the FSIA and *Bancec* inapplicable because the Palestinian Authority which created and the Palestine Monetary Authority the restraint was aimed at was not a sovereign nation afforded sovereign immunity.  *Palistine* 62 A.D. 3d at 222-223. In *EM Ltd case* the Second Circuit was not presented with a record in which a prima facie showing of alter ego allowed post judgment restraints under New York execution procedure, rather the evidence presented and weighed by the court below under the *Bancec* principles of extensive control the restrained trust entity was such that any separate juridical status it may have had was overcome. *EM Ltd*  389 Fed. App'x at 43.

   (ii)  <u>No fraud or injustice.</u>

   Further, the recognition of SOPAMIN as an entity apart from Niger would work no fraud

or injustice. *See Bancec,* 462 U.S. at 629-30. To qualify for this exception SOPAMIN must be said to constitute an "abuse[] of corporate form." *De Letelier,* 748 F.2d at 794. The declarations of SOPAMIN in opposition establish that Niger created SOPAMIN not to evade liability, but to facilitate trade in uranium concentrates, including by subjecting that trade to the pan-African laws of OHADA.[6] Ex-Im Bank offers this Court no evidence, let alone credible evidence, to establish that continuing to afford SOPAMIN separate legal status from Niger would work a fraud or injustice on Ex-Im Bank.

Faced with the impossibility of even getting close to meeting the requirements of *Bancec* for disregarding SOPAMIN's juridical status and sovereign immunity, Ex-Im Bank dredges the internet to support a claim of fraudulent conveyance at SOPAMIN's founding. Ex-Im Memo, p13 To make its argument in offers the court a publication on "African Economic Outlook" in support of Ex-Im Bank's claim that in 2007 Niger gave its mining rights to SOPAMIN. But in fact what the very article they cite from describes SOPAMIN relation to those mining assets as "…SOPAMIN which oversees Niger's mining assets…".[7] In contrast, the lawyers qualified under French and Niger law examining the creation of SOPAMIN in 2007 found that SOPAMIN's organizing documentation which included this very purpose to be in conformity with the governing law. *Follie Decl* ¶ 7 Moreover, as the declarations of SOPAMIN's Chief Trader and its Director, SOPAMIN must pay for the uranium it purchases as in the Exelon transaction, at clear has been no rights to material it has to pay for as Ex-Im Bank speculates. . *Hamadou Decl.* ¶13, *Moussa Decl.* ¶ 6 And to make its first purchase in 2007 SOPAMIN had to

---

[6] See *Byrd,* 974 F. Supp. 2d at 270 (citing e.g., *LNC Invs., Inc. v. Republic of Nicaragua,* 115 F. Supp. 2d 358, 366 (S.D.N.Y. 2000*)* (finding "no indication, that any 'fraud or injustice' will result from insulating the Central Bank's property from attachment in aid of execution of the judgment against Nicaragua."); *Katzir's Floor & Home Design, Inc. v. M-MLS.com,* 394 F.3d 1143, 1149 (9th Cir. 2004) ("The injustice that, allows a corporate veil to be pierced is not a general notion of injustice; rather, it is the injustice that results only when corporate separateness is illusory.")

[7] www.oecd.org/countries/niger/40578324.pdf

borrow money to make its purchase; clearly not vested in an asset from Niger as Ex-Im Bank

now asserts. *Hamadou Decl.* ¶ 6

Ex-Im cites New York Debtor Creditor Law §273-a in an attempt to assert that the

creating of SOPAMIN in 2007 resulted in a fraudulent conveyance by Niger, (Ex Im MOL at p

13).  This argument must fail for two reasons:  First, New York's fraudulent conveyance law has

a six-year statute of limitations and therefore any such claim would have expired in or about

2013. *See* N.Y. C.P.L.R. § 213; *Orr v. Kinderhill Corp*., 991 F.2d 31, 35 (2d Cir. N.Y.

1993).  Second, §273-a expressly requires that for a conveyance to be fraudulent, it must be

"made without fair consideration". New York Debtor Creditor Law §273-a.   Ex-Im does allege

that Niger received less than fair consideration in the creating of SOPAMIN.  Indeed, Ex-Im

acknowledges that Niger received 98% of SOPAMIN's shares. (Ex-Im MOL at 10, citing

Solomon Decl., Ex. S)

With respect to Ex-Im Bank's request for an adverse inference, such an adverse interest

can not be drawn against an instrumentality of a foreign sovereign.

> [A] court may not sanction a foreign instrumentality for discovery
> violations committed by its sovereign. *See De Letelier v. Republic
> of Chile*, 748 F.2d 790, 795 n.2 (2d Cir. 1984). In *Letelier*, the
> district court entered discovery sanctions against Chile, including
> an adverse evidentiary finding that the national airline of Chile was
> not a separate juridical entity from Chile. *Id.* at 793. The Second
> Circuit reversed, holding that "one party to litigation will not be
> subjected . . . to sanctions because of the failure of another to
> comply with discovery." *Id.; see also Funnekotter v. Republic of
> Zimbabwe,* No. 09 Civ. 08168, 2011 U.S. Dist. LEXIS 130363,
> 2011 WL 5517860, at *3-4 (S.D.N.Y. Nov. 10, 2011)

*Thai Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic,*
2013 U.S. Dist. LEXIS 110353, 19-20 (S.D.N.Y. Aug. 2, 2013)


## V.    THE FUNDS EX-IM BANK IS ATTEMPTING TO RESTRAIN ARE NOT
## USED FOR COMMERCIAL PURPOSES IN THE UNITED STATES

Even if Ex-Im Bank were able to establish that this Court had jurisdiction over SOPAMIN and that SOPAMIN's separate legal status should be disregarded, the very nature of the funds Ex-Im Bank attempts to restrain precludes such a restraint.

The provision of the FSIA which governs both attachment and execution on the property of a sovereign in the United States only allows for either attachment or execution on property "…,used for a commercial activity in the United States,…". 28 U.S.C. 1610 (a) (2015) In a recent case the United States Court of Appeals for the Second Circuit addressed that very section of the FSIA in a case before it involving the property of statutory corporations of Grenada upon which the plaintiff in these proceedings, Ex-Im Bank, attempted to execute. *Export-Import Bank of the Republic of China v. Grenada et.al.* 768 F.3d 75 (2d Cir, 2014) ("*Grenada"*) As Judge Carney writing for the court noted, the court below in that case never even reached the issue of whether Grenada's statutory corporations were alter ego's of Grenada, but instead assumed that even if Ex-Im Bank could carry the day on that threshold issue, the funds were nonetheless immune from execution. *Grenada* at 81 For the purposes of its decision, the Second Circuit made the same assumption. *Grenada* at 90 n16 Applying the only exception allowing for execution on the property of a sovereign as provided for in Section 1610(a) within a legal framework adopted from decisions in both the Fifth and Ninth Circuits, the Second Circuit articulated a three prong test for what it termed its "attachment inquiry". *Grenada at* 89,91,92 One prong of the court's test inquired whether the funds were property belonging to the instrumentality or to the judgment debtor sovereign. *Grenada* at 92. The two remaining prongs of the court's inquiry scrutinized whether the property satisfied the "commercial use" and "in the United States" Section 1610 (a) exception for attachment. *Grenada* at 90 Applying that framework to the record before it the Second Circuit concluded that most of the funds at issue

24

meet neither the commercial use requirement that the property be utilized in the service of the debtor sovereign's commercial activity and that commercial activity was to take place in the United States. *Grenada* at 91

Here the evidence before this Court is unambiguous and with facts well known to Ex-Im Bank through its discovery of Exelon. *Mavro Decl.* ¶ 6The funds are payments due under the contract between Exelon and SOPAMIN. *Moussa Decl.* ¶ 2 The judgment debtor Niger has had no role in the negotiation or performance of that contract. Id. *Hamadou Decl*. ¶ 11.  Niger has no interest in the funds Exelon is to pay to SOPAMIN. Id. The funds that are to be paid are to be used to pay the mining companies in Niger that produced the uranium which SOPAMIN sold as uranium nitrates to Exelon for its reactors. *Hamadou Decl*. ¶ 13, *Moussa Decl.* ¶ 6 And those funds go directly to support the mining companies in Niger which are a principal part of the economic activity of Niger. *Moussa Decl.* ¶ 7, *Hamadou Decl*. ¶ 13 Thus the funds Ex-Im Bank seeks to restrain would meet neither the "commercial use" nor the "in the United States" requirements of the Section 1610(a) exceptions to allow for a restraint on these funds even if Ex-Im Bank were able to carry its heavy burden of proving the funds are the property of Niger rather than the property of SOPAMIN.

Concomitantly, Ex-Im Bank is equally unable to satisfy the third prong of *Grenada's* "attachment inquiry" which requires sufficient proof that the funds are the property of the judgment debtor sovereign rather than its alleged alter ego. *Grenada* at 92 Unlike the record in *Grenada* which the Second Circuit found unclear warranting discovery on that issue, the evidence before this Court is both clear and convincing. Id. The Chief Trader for SOPAMIN, a Member of its Board of Directors from its creation and its Director General have all attested under penalty of perjury, with supporting documentation, that the funds Ex-Im Bank seeks to

restrain are the property of SOPAMIN and not the property of Niger. *Moussa Decl.* ¶ 2, *Hamadou Decl.* ¶ 11 The discovery Ex-Im Bank has conducted of Exelon by both deposition and document production have demonstrated that the funds belong to SOPAMIN, not to Niger. *Mavro Decl.* ¶ 6 Faced with no ambiguity as to the funds belonging to SOPAMIN any discovery on that issue would be inappropriate.

## VI.  EX-IM BANK CAN NOT ESTABLISH GROUNDS FOR EITHER A TEMPORARY RESTRAINING ORDER OR AN ATTACHMENT

Even if Ex-Im Bank were able to overcome the jurisdictional obstacles to proceeding before this Court, it still could not establish the grounds for the issuance of either a temporary restraining order.  As noted above, because SOPAMIN has never waived its right to sovereign immunity, before judgment or otherwise, the FSIA prohibits attachment of its assets. 28 U.S.C. § 1610(d)(2015).  Ex-Im Bank cannot escape this fact by seeking injunctive relief here. "The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property.  We hold that courts in this context may not grant, by injunction, relief which they may not provide by attachment."  *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983)

In any event, Ex-Im Bank even fails to carry the burden required by its request for injunctive relief.  In order to obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party must show (1) that it will suffer irreparable harm in the absence of an injunction, and (2) either (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits that make them fair grounds for litigation and a balance of hardships tipping decisively in the movant's favor. See *Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.

2004); *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004); *Tom Doherty Assocs. v. SabanEntm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).

Because a preliminary injunction is an "extraordinary remedy . . . . [i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . . [and] should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376-77 (2008) (citations and internal quotations omitted).

Irreparable Harm

The irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curium). Irreparable harm is defined as "harm to the plaintiff's legal interests that could not be remedied after a final adjudication," such as when "the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss."*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012); see also *Tom Doherty Assocs.*, 60 F.3d at 37 (defining irreparable harm as "an injury that is not remote or speculative but actual and imminent and for which a monetary award cannot be adequate compensation." (internal quotation marks omitted))

In *CRP/Extell Parcel I, L.P. v. Cuomo*, the Second Circuit clarified that a claimant's alleged "unquantifiably difficult" prospect of collecting payments at a later date *does not* constitute irreparable harm:

> We have long held that an injury compensable by money damages is insufficient to establish irreparable harm. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). This does not mean that a party at risk of suffering a monetary loss may never receive injunctive relief, but it does mean that, notwithstanding any

> compensable losses, a movant must provide evidence that it is likely to suffer damage that cannot be rectified by financial compensation before a district court may providently exercise its equitable power to grant injunctive relief. *See id.*
>
> Plaintiff-Appellant argues that it will suffer irreparable harm absent injunctive relief for two reasons. First, plaintiff-appellant states that it will be "unquantifiably difficult" to recover the escrow payments at a later date, since a significant number of enforcement actions would be required to obtain and enforce judgments against the recipients of these funds. Second, plaintiff-appellant makes the conclusory assertion that the recipients of the escrow monies will "spend" whatever payments they receive, and could subsequently become insolvent, rendering any ultimate victory Pyrrhic. Neither contention is sufficient to establish irreparable harm in this case.
> 394 Fed. Appx. 779, 781 (2d Cir. N.Y. 2010).[8]

Here, Ex-Im Bank seeks to restrain funds being paid on the Exelon /SOPAMIN contract running through 2015.  *Hamadou Decl.* Exh. 10  Having taken discovery of Exelon, Ex-Im Bank is aware that another substantial payment under that contract will occur upon a delivery in June or July of this year. *Mavro Decl.* Exh. B, p120  Ex-Im Bank also learned during that discovery of Exelon that SOPAMIN and Exelon are in the process of discussing extension to that contract. *Mavro Decl.* Exh. B, p116-7  Moreover, obviously on the possibility of repeated demands for disclosure after the initial discovery of Exelon in November of 2014, Ex-Im Bank was provided assurance in a Stipulation with Exelon's lawyers regarding execution on the May 24, 2010 Exelon/SOPAMIN. *Mavro Decl.* ¶ 9  Moreover, in compliance with that Stipulation Ex-Im Bank's lawyers were advised that payment to SOPAMIN would not be made before February 15. *Mavro Decl.* ¶ 5

Clearly, Ex-Im Bank suffers no irreparable harm by denying them a restraint on this payment and certainly not at this time when no payment will be made prior to February 15th.

---

[8]The Court in *Cuomo* also noted that in certain instances "a finding of irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." *Id.* at 781-82.  Here, no such allegation is made by Ex-Im Bank, and indeed, SOPAMIN is in no such danger so long as it is able to receive payments in the ordinary course of business.

<u>Likelihood of Success on the Merits</u>

SOPAMIN was created and exists under the laws of Niger and the Pan-African commercial treaty of OHADA. *Hamadou Decl.* ¶ 4 The government of Niger is the majority shareholder of SOPAMIN, making SOPAMIN an Instrumentality of NIGER under the FSIA. Id. *Mavro Decl.* ¶ 3 As such, SOPAMIN has a formal business structure that includes:  a Board of Directors, a Director General, SOPAMIN employees with employment contracts and records kept in the ordinary course of business. *Hamadou Decl.* ¶ 5,7,8  SOPAMIN has the rights of business entities such as property rights and legal capacity.  *Hamadou Decl.* ¶ 12  Like any other business entity in Niger, SOPAMIN must compete for business which it has lost to other companies. *Hamadou Decl.* ¶ 10

SOPAMIN is treated by the government of Niger like any another business entity. *Hamado Decl.* ¶ 8 SOPAMIN pays taxes to the government tax authorities and has been subject to tax audits by those authorities. Id. As any business entity, SOPAMIN maintains liability and employee health insurance policies. *Hamadou Decl.*¶ 10

The government of Niger does not control and has not interfered in the business operations of SOPAMIN. *Hamadou Decl.* ¶ 10, 12 Since its creation in 2007, SOPAMIN has remained free of any interference in its business from the government of Niger. *Hamadou Decl.* ¶ 10 The only funds the government of Niger has ever received from SOPAMIN  have been in the form of taxes and dividends. *Id.*

Counsel familiar with the laws of Niger, as well as the French legal system which Niger modeled its legal system on, has examined the law, the creation and structure of SOPAMIN as well as its operations to date and concluded that SOPAMIN is a commercial entity independent from and legally separate from the government of Niger. *Follie Decl.* ¶ 47 In conducting such a

through examination of both the structure and operations of SOPAMIN in the context of the laws of Niger as well as the OHADA treaty, M.Follie has surpassed the limited criteria offered the Court in 1998 by Ex-Im Bank to establish that Ex-Im Bank was an independent instrumentality of the Republic of China.  *Decl. of Kai-Kuo* ¶ 10

These undisputed facts establish that SOPAMIN is an instrumentality of the government of Niger, independent of the government and a separate juridical business entity. No credible evidence exists that SOPAMIN is under the extensive control of the government of Niger. Nor does any evidence exist that recognizing SOPAMIN's independent juridical status would perpetuate either a fraud or allow for an injustice.  Faced with such facts, Ex-Im Bank would be unable to overcome the presumption of independence of sovereign instrumentalities to carry its burden of proof necessary to establish the likelihood of succeeding on the merits necessary for the issuance of a temporary restraining order or a preliminary injunction.

<u>Balance of Hardships and Public Consequences of any Injunction</u>

Refusing to grant a temporary restraining order or a preliminary injunction restraining Exelon from making payment to SOPAMIN presents no hardship for Ex-Im Bank. Additional deliveries and substantial payments under the May 24, 2010 contract are scheduled for June or July of this year. *Mavro Decl.* Exh. B, p120  SOPAMIN and Exelon are already negotiating an extension of the May 24, 2010 contract. *Mavro Decl.* Exh. B, p116-7  Facts Ex-Im Bank has been aware of since November of 2014.  *Mavro Decl.* ¶ 4

In contrast, SOPAMIN and Exelon, as well as the public in both the Untied States and Niger, will face significant hardship if Ex-Im Bank is allowed to disrupt the May 24, 2010 contract, which provides nuclear fuel to Exelon's reactors. In considering whether to grant Ex-Im Bank's request for a temporary restraining order or a preliminary injunction, the Court must

consider the hardship such a restraint would have on the participants to these proceedings as well as to the public at large. See *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24, 129 S. Ct. 365, 172  (2008).

The payment Exelon is to make is to be used by SOPAMIN to make payment in its back-to-back transaction with the uranium mining companies in Niger. *Moussa Decl.* ¶6   That payment must be made within thirty days of delivery of the uranium concentrates to Exelon. Id. This last shipment was made on January 15th so that payment would be due February 15th. *Mavro Decl.* ¶ 4  By restraining those funds and preventing payment to the uranium mining companies in Niger, those mining companies are denied the revenues needed for funding those mining operations. *Hamadou Decl.* ¶ 13 Such a disruption would severely impact the economic activity that depends on regular mining activity as a principal source of employment in Niger. Id. *Moussa Decl.* ¶ 7  Moreover, with those mines being located near the border of Mali and Algeria, both political instability and renewed terrorist activity would be another consequence of disrupting these payments. *Moussa Decl.* ¶ 7

Further, interfering with the execution and performance of the May 24, 2010 contract will also so damage SOPAMIN's reputation among the small number of utilities that purchase nuclear fuel that SOPAMIN will most likely be unable to make future sales to those utilities. *Moussa Decl.* ¶ 5  The utilities that purchase nuclear fuel must depend upon a reliable supply of fuel to meet the electric demands of its consuming public. Id. Interfering with SOPAMIN's ability to reliably provide such fuel would obviously make those buyers unwilling to rely on SOPAMIN into the future. Id.

Similarly, Exelon would face equal hardship if the May 24, 2010 contract were disrupted with a restraint of payment. The June or July delivery Exelon has included in its fuel supply

through 2015 would be prevented by a disruption of the contract. Not only is Exelon's supply disrupted, but if SOPAMIN's uranium concentrates are unavailable in the market, the price of uranium concentrates is likely to rise dramatically. And as a public utility, the prices that Exelon charges to its consumers of electric power in the United States will also rise.

Without doubt, the hardships to be faced by SOPAMIN, Exelon and the public in both the United States and Niger would certainly outweigh any hardship Ex-Im Bank may allege to obtain a temporary restraining order or preliminary injunction.

## CONCLUSION

For the foregoing reasons, SOPAMIN respectfully prays that this Honorable Court deny Ex-Im Bank's Order to Show Cause for the issuance of a temporary restraining order and grant SOPAMIN a Protective Order Precluding Ex-Im Bank from attempting to execute on SOPAMIN's property, and award such other and further relief as it may deem appropriate.

Dated: New York, New York
        February 10, 2015

**MAVRONICOLAS & DEE LLP**

By: /s/ Anthony J.  Mavronicolas
    Anthony J. Mavronicolas
    Peter C. Dee
    415 Madison Avenue, Floor 18
    New York, New York 10017
    Tel.:  646.770.0024
    Fax:  866.774.9005
    amavronicolas@mavrolaw.com
    pdee@mavrolaw.com

    *Attorneys for Interested Third Party*
    *La Societe de Partimoine des Mines du Niger*

32

# EXHIBIT A

Alexander D. Calhoun (AC 5621)
Paul E. Summit (PS 6263)
GRAHAM & JAMES LLP
885 Third Avenue, 24th Floor
New York, New York 10022
(212) 848-1000

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— X

THE EXPORT-IMPORT BANK OF THE
REPUBLIC OF CHINA,                              :        97 CIV. 3090 (LAK)

                              Plaintiff,        :
                                                :
            - against -

REPUBLIQUE DU NIGER,                            :

                              Defendant.        :

———————————————————— X

**DECLARATION OF NIEH KAI-KUO IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY
PURSUANT TO FED.R.CIV.PRO.37**

&Ex B

            I, Nieh Kai-Kuo, attorney-at-law, under penalty of perjury, hereby declares:

1)          I am an attorney admitted to practice in the Republic of China.   I submit
this affidavit in support of the opposition of Plaintiff The Export-Import Bank of the
Republic of China (the "Ex-Im Bank") to Defendant's motion pursuant to Rule 37 of
the Federal Rules of Civil Procedure to compel Plaintiff to answer certain objected to
interrogatories and document requests demanded by Defendant.

2)          Attached hereto as Exhibit A is a current version of my curriculum vitae
which demonstrates my knowledge and experience in the laws of the Republic of
China.

3)      In preparing this affidavit, I have reviewed Defendant's First Set of Interrogatories, Defendant's First Request For Production of Documents, and Plaintiff's responses to the same, copies of which were provided to me by Plaintiff.

4)      I have also reviewed the documents which would arguably be responsive to Defendant's discovery requests, but have been withheld by the Plaintiff on various grounds, including the secrecy laws of the Republic of China ("Documents").   For me to have access to and gain authorization to review the Documents, Plaintiff had to comply with the following procedures as required by the laws of the Republic of China.   Plaintiff had to file an application under Articles 20, 21 and 27 of the Rules Governing the Protection of State Secrets (the "Rules") with each of the Ministries or other agencies of the Republic of China who were the makers or authors of one or more of the Documents.   Each such application explained the proceeding before the Court and the need that I be furnished with copies of such Documents for my review. I was given access to the Documents only after Plaintiff had received specific approval of its foregoing applications from the maker or author of each of the Documents.   Based on my review of said documents and my understanding of the Republic of China laws and, in particular, the Rules, I have prepared this affidavit.

5)      The Rules govern and protect the state secrets of the Republic of China. The Rules were promulgated by the Executive Yuan, that is, the Executive Branch of the Republic of China, in 1960, and were subsequently amended in 1984.   State secrets are defined in the Rules to mean and include documents, pictures, information and things which require confidential treatment. (Article 2)   Those governed by the Rules are, among others, agencies and elected bodies of, as well as companies owned by, the Republic of China or its political sub-divisions at all levels (collectively, "Public Bodies").   Employees of any Public Body are required under Article 4 of the Rules to strictly protect the confidentiality of state secrets and to take all measures necessary to ensure that unauthorized disclosure of state secrets will not occur.   Since employees of a Public Body are by definition "civil servants" under Article 24 of the Civil Servants Services Act of the Republic of China, they are subject to the same duty with respect to state secrets under Article 4 of the Civil Servants Services Act of the Republic of China.

6)      State secrets are classified into four categories under Article 7 of the Rules, namely:

a) "Absolutely confidential": Materials or information the unauthorized disclosure of which will cause the most substantial damage to the national security of the Republic of China;

 "Most confidential": Materials or information the unauthorized disclosure of which will adversely affect the national security of the Republic of China or will substantially damage the national interest and dignity of the Republic of China to the benefit of any foreign government;

c) "Confidential": Materials or information the unauthorized disclosure of which will damage the national interest or dignity of the Republic of China or will benefit a foreign state; and

d) "Secret": Materials or information other than those stated in (a) through (c) above, that require confidential treatment.

7)    Those who are authorized to designate the category to which any document or information belong (the "Designation") are specified in Article 9 of the Rules. Briefly and for purposes of this Affidavit, the Minister or the head of a Department concerned of a Ministry of the Republic of China is authorized to make the Designation for any document or information made by any official of that Ministry. Where the maker/author of a document is an official of the Central Bank of China, the Governor, or the head of the Department concerned, of the Central Bank of China is authorized to make the Designation.   The official entitled to make the Designation under Article 9 by reason of his office is hereinafter referred to as the Competent Authority.

8)    Access to state secrets by those not the designated recipient(s) is only permitted under the procedure set forth in Articles 18, 19, 20 and 21 of the Rules.

9)    Article 18 governs where any Republic of China governmental agency with the authority to conduct investigation or enquiries requires access to state secrets for its investigation or enquiries.   Article 19 provides the procedure for the access to such secrets where any agency of the Republic of China or any political sub-division thereof has a business need.   Article 20 applies where any agency of or company owned by the Republic of China or any political sub-division thereof may, upon

approval by the Competent Authority, permit academic institutions, experts, scholars, business enterprises or voluntary associations to have access to state secrets upon prior approval by the Competent Authority.    Disclosure of state secrets to foreign governmental agencies or non-governmental bodies is governed by Article 21 of the Rules, under which state secrets other than those that are military-related or foreign-relations related may be disclosed upon prior approval of the Competent Authority. Where state secrets are related to foreign relations, they may be disclosed only in accordance with the procedure established by the Ministry of Foreign Affairs ("MOFA").

10)     Plaintiff was established under The Export-Import Bank of The Republic of China Act, 1978, as last amended in 1984 (the "ACT"), attached hereto as Exhibit B. The fact that Plaintiff is more than 50% owned by the Republic of China makes it a state-owned company for purposes of the laws of the Republic of China. (Article 3 of Regulation of State-Owned Company Act)    Accordingly, both the Plaintiff and its Directors, Supervisors and General Managers and other employees are subject to and governed by the Rules and the Civil Servants Service Act of the Republic of China.

11)     All the Documents in question are classified as "Most Confidential" or "Confidential" by the maker/author thereof who, under Article 9 of the Rules, had the authority by reason of his office to make the Designation.

12)     It is my opinion, based on my review of the Documents and my knowledge of the laws of the Republic of China, including the Rules, that disclosure other than that specifically authorized by its maker/author of any of the Documents or any information contained therein by any employee of the Plaintiff would cause such employee to be subject to the following penalties and administrative sanctions:

   a)    A civil servant guilty of making unauthorized disclosure of any state secret is punishable by imprisonment of a term not exceeding three (3) years. (Article 66 of the Rules and Article 132 of the Criminal Code of the Republic of China); and

   b)    A civil servant guilty of unauthorized disclosure of state secrets may be dismissed or suspended from his office, demoted, reprimanded, or have his salary deducted or a demerit recorded against him.    (Article 4 of the Civil Servants Services Act and Article 9 of the Civil Servants Sanctions Act).

13)      It is my further opinion, based on my review of the Plaintiff's applications to Competent Authorities concerned referred to in paragraph 4 of this Affidavit, as well as approvals given by said Competent Authorities, that it is permissible and not a violation of the applicable Rules for most of these documents to be submitted to this honorable Court for an in camera review by the Court alone.    If the requisite approvals are obtained for the balance of the documents, of course, then they can be reviewed in camera by the Court as well.

14)      Finally, in regard to the question of whether Ex-Im Bank is a competent juristic person, my opinion is as follows:

a)   The express purpose of the Bank's establishment was to promote export trade and economic development. (Exhibit B, Article 1)    Under the Act, the Bank is a juristic person. Id.

b)   Since the Bank was established as a juristic person, it is vested with all rights under the law (Article 26, Section 1, of the Republic of China Civil Code).    It has the ability to enter into contracts and the capacity to sue or be sued in its name (Article 40, Section 1, of the Republic of China Civil Procedure Code).    Under the Act, it has the ability to sustain losses and make profits. (Articles 12 and 12-1 and 12-2 of the Act).

c)   Its assets and liabilities are distinct from those of the Republic of China. All decisions pertaining to, e.g., business policies, budget, extension of loans or credits or providing guaranties or export insurance, etc. are exclusively made by the Bank's Board of Directors.

d)   It is my opinion that the Bank is a juristic person established under the Act to independently engage in the business and activities set forth in Article 4 of the Act for the promotion of export trade and economic development, and to sustain losses and make profits.    The statement in the Act that the Bank is subject to the supervision of the MOF is, in my opinion, a requirement that also applies to all other banking institutions doing business in the Republic of China (See Articles 4, 19 and 117 of the Republic of China Banking Act).    While members of the Board of Directors are appointed by the MOF, there is nothing in the Act that requires the Board or any of its members to obtain directions from the MOF in carrying out the decision-

5

making role in the Board.   In addition, while engaging in the businesses and activities described in Article 4 of the Act, the Bank is not required to seek the prior approval of the MOF.

Dated:      Taiwan, R.O.C.
            May 11, 1998

Nieh Kai-Kuo

本文件之簽名或蓋章，經中華民國台
灣台北地方法院公証處公証人認証。
                公証人   陳 幼 麟
Attested on this_____day,_____MAY 11 1998
19___, at the Taiwan Taipei District
Court, Republic of China, That the
signature(s)/seal(s) in this docu-
ment is/are authentic,

Jen Tzu _____
No.123895            Chen, Yu-Lin
                     Notary Public