UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
—————————————————————X

THE EXPORT-IMPORT BANK OF THE REPUBLIC OF
CHINA,

                   Judgment Creditor,     97 Civ. 3090 (LAK)

    -against-

REPUBLIQUE DU NIGER,

                   Judgment Debtor,     **ATTORNEY DECLARATION**

    -and-                                         **IN OPPOSITION TO ISSUANCE OF**

LA SOCIETE DE PATRIMIONE DES MINES DU NIGER,    **TEMPORARY RESTRAINING ORDER**

                   Interested Third Party.
—————————————————————X

       1. I am an attorney admitted to the Bar of this Honorable Court, counsel for Interested Third Party La Societe De Patrimione Des Mines Du Niger ("SOPAMIN"), and declare the following in opposition to the issuance of a temporary restraining order which would be a violation of SOAPMIN's sovereign immunity under the Foreign Sovereign Immunities Act 28 USC § 1602 et. seq. (2015) ("FSIA").

       2. In submitting its opposition as an interested third party SOPAMIN reserves its rights pursuant to 28 USC § 1330(c) ( 2015) not to confer personal jurisdiction with respect to its appearance before this Honorable Court.

       3. In 1998 the Plaintiff in this matter, The Export-Import Bank of the Republic of China ("Ex-Im Bank"), obtained a judgment against the Republic of Niger ("Niger") arising out of an alleged development loan to Niger. The government of Niger is the majority shareholder in SOPAMIN which is an instrumentality of Niger entitled to

sovereign immunity under the FSIA. 28 USC § 1603(b) and § 1604 (2015). (Exhibit A)[1] (www.SOPAMIN-SA.com) SOPAMIN did not come into existence until after both the alleged development loan to Niger and the Plaintiff Ex-Im Bank obtaining a judgment against the government of Niger as a result of an alleged default on that development loan. *Hamadou Decl.* ¶ 12[2] SOPAMIN is a limited commercial company created under the laws of Niger and the Pan-African commercial OHADA treaty to which Niger is a party. Id.

    4. As a seller of uranium concentrates to utilities that use that product as a fuel for their nuclear reactors to generate electricity, SOPAMIN entered into a May 24, 2010 contract with the American electricity generating utility Exelon Generation Company LLC ("Exelon"). *Hamadou Decl.* ¶ 11 Under that sales contract SOPAMIN delivered uranium concentrates to Exelon on January 15, 2015 for which Exelon was obligated under the sales contract to make payment within thirty days of that delivery. *Hamadou Decl.* Exh. 10

    5. SOPAMIN has learned that Ex-Im Bank in aid of execution of its judgment against the government of Niger has obtained discovery of Exelon documents and taken the deposition of Exelon regarding the sales contract between Exelon and SOPAMIN. SOPAMIN has also learned that counsel for Exelon and Ex-Im Bank have entered into a Stipulation that required Exelon's attorney to provide Ex-Im Bank's attorneys with twenty-five days notice prior to making any payment to SOPAMIN under that sales contract. In compliance with that Stipulation, the attorneys for Exelon have given the Ex-

---

[1] References to Exhibits A-D attached hereto
[2] References to Declaration of Hamma Hamadou filed herein. (Certificates for the translations of Exhibits 1-11 in French attached as Exhibit D)

Im Bank attorneys notice that payment will be made on February 15, 2015. SOPAMIN learned on January 28th that Ex-Im Bank now intends to move before this Honorable Court on February 9th to obtain a temporary restraining order restraining Exelon from making any payments to SOPAMIN.

6. Ex-Im Bank has information that Niger had no role in either the negotiation or execution of the May 24, 2010 contract and that SOPAMIN was an instrumentality with sovereign immunity. On November 11, 2014 in response to its subpoena, Ex-Im Bank took the deposition of Exelon and received documents from Exelon regarding the May 24, 2010 contract between Exelon and SOPAMIN. During that deposition Ex-Im Bank learned the following through the testimony of Exelon's FRCP 30(b)(6) witness:

   a. Questioned about the Force Majeure Clause of the Exelon/SOPAMIN contract, the Exelon witness testified: Q: You see that it refers to in Paragraph C " acts or omissions of any governmental authority (other than SOPAMIN), " then it goes on from there. Isn't it fair reading of that that you regarded SOPAMIN at the time as a governmental authority. Mr. Croke: Objection, Calls for a legal conclusion. A: I think it was unclear to us what SOPAMIN's status was, and we wanted to be clear that they could not act under cover of government authority and be excused. (Exhibit B p.48-9)

   b. Questioned about the negotiations over the first contract between Exelon and SOPAMIN, the Exelon witness testified: Q: And what happened next.? A. There were some initial discussions back and forth. Ralph met with the SOPAMIN people. Q: Ralph? A: Hunter who was my boss at the time. Q: Uh-huh. A: Met the SOPAMIN people in Toronto in February of 2007.(Exhibit B. p.15)

   c. Questioned about negotiations in 2014 over extending the May 24, 2010 contract, the Exelon witness testified: Q: … and him, that was a substantive meeting at Exelon. A: Correct. Q: And was Ibrahim Moussa-Gros the only SOPAMIN representative at that meeting? A: He was. Q: Was there any representative from the Niger government-any other Niger entity? A: There was no one from Niger. (Exhibit B, p117)

   d. Questioned later in the deposition by the Exelon lawyer about this meeting, the Exelon witness testified: Q: You mentioned earlier that

> at one point you had a meeting in the US with Ibrahim Moussa-Gros and Arno Brand. Do you recall that? A: I do. Q: And you gave some testimony in response to a question from counsel for the Ex-Im Bank with respect to whether there was anyone "else" from Niger who was at those meetings. Do you recall that? A: I do. Q: When you responded that there was no one else from Niger at that meeting, what did you mean by no one else from Niger? A: I mean that there was no one other than Ibrahim was from the Country of Niger. Q; You didn't mean that he represented Niger in any way? A: I did not mean that he represented the Country or whatever. I simply speak of his nationality. (Exhibit B,p165-6)

At no point in that entire deposition of Exelon's witness did Ex-Im Bank obtain testimony to the effect that the government of Niger and SOPAMIN acted as the same entity in regard to the SOPAMIN/Exelon contracts. (Exhibit B) Nor did any of the documents Exelon produced for Ex-Im Bank provide any evidence that SOPAMIN's sovereign immunity should not be recognize under the FSIA, or that SOPAMIN's property could be retrained in any manner or executed upon in satisfaction of Ex-Im Bank's judgment against Niger. (Exhibit C)

7. The government of Niger thus has played no part in the negotiation or execution of the sales contract between SOPAMIN and Exelon, and the government of Niger has no interest in the funds being paid to SOPAMIN by Exelon under that sales contract. *Hamadou Decl.* ¶ *11* As the undisputed evidence before this Honorable Court establishes, SOPAMIN was duly created and exists as an independent legal entity under the laws of Niger. *Hamadou Decl.* ¶ 4 Similarly, the undisputed evidence before this Honorable Court establishes that SOPAMIN has always been operated, and conducts its business, as a legal entity separate and distinct from the government of Niger. *Hamadou Decl.* ¶ 5, 8 Further, the undisputed evidence before the Court establishes that the

government of Niger has never controlled or interfered in SOPAMIN's business. *Hamadou Decl.* ¶ 12

8. The funds that SOPAMIN receives from Exelon under the sales contract are used to pay the mining companies in Niger that produce the uranium that SOPAMIN sells to Exelon as uranium concentrates within thirty days of SOPAMIN delivering under the sales contract to Exelon. *Hamadou Decl.* ¶ *13* In turn the mining companies use those payments to fund their mining operations. Id. By preventing those funds from reaching those mining companies Ex-Im Bank is disrupting that mining activity as well as the entire economic activity in Niger that depends on that mining activity. Id. That disruption may well lead to serious political instability in a region in Niger boarding Algeria and Mali already subject to cross-border terrorist activity. Id. At the same time, a restraint on these funds would have a catastrophic effect on SOPAMIN which would lose its credibility in the uranium concentrates market as a reliable supplier of fuel for their buyers' nuclear reactors ending SOPAMIN's ability to sell uranium concentrates in the future. *Moussa-Gros Declaration* ¶ 5[3]

9. In contrast to the substantial hardship SOPAMIN would face in the event that the Exelon payment for the January delivery were to be restrained, Ex-Im Bank obtained evidence in its deposition of the Exelon witness that the contract under which this payment is to be made provide for yet another deliver and substantial payment by Exelon in June or July of this year. (Exhibit B, p.120) Ex-Im Bank also received evidence at the Exelon deposition that Exelon and SOPAMIN have already begun negotiating a further extension of that contract. (Exhibit B, p116-7) All of this information was made know to

---

[3] References to Declaration of Ibrahim Moussa-Gros filed herein.

Ex-Im Bank as early as the deposition of Exelon that was taken on November 11, 2014. (Exhibit B) But only now, months later, on the eve of payment, does Ex-Im Bank now allege the exigencies of urgency of action on this Honorable Court. In having delayed as it has Ex-Im Bank threatens SOPAMIN with the greatest hardship by disrupting not only SOAPMIN's sale contract with Exelon, but SOPAMIN's payment to the mines which provided the uranium for this delivery.

10. Accordingly, SOPAMIN has now responded before this Honorable Court in opposing the issuance of any temporary restraining order and seeking a protective order pursuant to Rule 69 of the Federal Rules of Civil Procedure and Section 5240 of the Civil Practice Law and Rules of New York restraining Ex-Im Bank from taking any action, in any jurisdiction, to execute on funds to be paid to SOPAMIN by Exelon under the May 24, 2010 sales contract.

February 8, 2015
New York, New York

Anthony J. Mavronicolas