# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT
                            FOR THE
 2                 SOUTHERN DISTRICT OF NEW YORK
 3
 4    THE EXPORT IMPORT BANK OF   )
      THE REPUBLIC OF CHINA,      )
 5                                )
                    Plaintiff,    )
 6                                ) Civil Action
              vs.                 ) No. 97 CIV 3090
 7                                )
      REPUBLIQUE du NIGER,        )
 8                                )
                    Defendant.    )
 9
10
11            THE DEPOSITION OF JAMES E. NEVLING,
12    taken before Cordelia Busse Wert, a Certified
13    Shorthand Reporter and Notary Public within and
14    for the State of Illinois, taken pursuant to the
15    provisions of the Federal Rules of the United
16    States District Courts pertaining to the taking of
17    depositions, taken at One South Dearborn Street,
18    Suite 3800, Chicago, Illinois, at the hour of
19    approximately 9:32 a.m. on November 11, 2014.
20
21
22
23
24
```

**Page 22**

1  A.  I couldn't swear to any individual
2  names.
3  BY MR. SUMMIT:
4  Q.  Okay.
5  A.  I know they had legal counsel at one
6  point. I know they had a finance guy at one
7  point. I don't know either of their names.
8  Q.  Now, were the legal counsel Nigerien?
9  A.  Yes.
10 Q.  And the financial guy was Nigerien?
11 A.  Yes.
12 Q.  So far as you know, were they counseled
13 at all in connection with this first agreement
14 that we've marked as Exhibit 6 by US counsel or
15 financial advisors?
16     MR. CROKE: Objection to form. What do
17     you mean by "were they counseled"?
18     MR. SUMMIT: Well, I'll -- I think it's
19     clear, but let me rephrase it.
20 BY MR. SUMMIT:
21 Q.  So far as you know, did US counsel play
22 any role at all on their behalf, on SOPAMIN's
23 behalf, in connection with the first agreement?
24 A.  I'm not aware of any US counsel that

**Page 23**

1  played a role.
2  Q.  Okay. And the same question as to
3  financial advisors, any US financial advisors on
4  behalf SOPAMIN?
5  A.  I'm not aware of any US financial
6  advisors.
7  Q.  Okay. And during your two trips there,
8  did you meet any -- did you meet the Minister of
9  Mines for Niger?
10 A.  Yes.
11 Q.  Do you recall his name?
12 A.  Mohamed Abdoulahi.
13 Q.  And correct me if I'm wrong, but I
14 think the spelling is M-O-H-A-M-E-D and
15 A-B-D-O-U-L-A-H-I.
16     And what were the circumstances under
17 which you met Mr. Abdoulahi?
18 A.  We went to his office. He expressed
19 some satisfaction that we were there to do
20 business directly and not through Areva.
21 Q.  Did Exelon in connection with this
22 potential contractual relationship with SOPAMIN --
23 A.  Uh-huh.
24 Q.  -- do any kind of investigation of

**Page 24**

1  SOPAMIN?
2  A.  No. In truth, not.
3  Q.  Did you have an understanding during
4  the period of negotiations with SOPAMIN as to
5  whether SOPAMIN was a governmental entity or a
6  nongovernmental entity?
7      MR. CROKE: Objection, calls for a
8      legal conclusion.
9  BY MR. SUMMIT:
10 Q.  But I think he's saying you can answer
11 it anyway.
12     MR. CROKE: You can answer it.
13 BY THE WITNESS:
14 A.  Did I have an understanding?
15 BY MR. SUMMIT:
16 Q.  Yes.
17 A.  It was plain that they were affiliated
18 in some fashion with the government.
19 Q.  And what made you derive that
20 conclusion? What brought you to that conclusion?
21 A.  It was the meeting with the Mines
22 Minister. It seemed to get relatively high-level
23 attention, the potential deal.
24 Q.  How do you know that? How do you know

**Page 25**

1  it was getting high-level attention?
2  A.  Well, I mean, he's the Minister of -- a
3  Government Ministries Cabinet Minister. I'm
4  reasonably confident that I haven't met with a
5  Cabinet Minister from any of my other suppliers.
6  Q.  Who are your other suppliers, if I may
7  ask?
8  A.  Oh.
9      MR. CROKE: Objection to the form.
10     Other suppliers for what?
11 BY MR. SUMMIT:
12 Q.  I assume we're talking about --
13 A.  Uranium.
14 Q.  -- uranium, the technical term being
15 triuranium --
16 A.  Triuranium octoxide.
17 Q.  -- octoxide. Thank you.
18     Who are the other supplies to Exelon?
19 I just -- I just would like to get a sense of the
20 landscape here of the other suppliers to Exelon of
21 U3O8.
22 A.  Currently there are, I don't know, a
23 dozen, 15, without precision.
24     We have contracts with Areva. We have

**Page 26**

```
 1   contracts with Tenex which is the Russians.  We
 2   have contracts with Rio Tinto from mining projects
 3   in Australia.  We have contracts with Cameco from
 4   Canada.  And there are a number of intermediary
 5   firms.
 6      Q.   Okay.
 7      A.   Brokers, traders, and so forth.
 8      Q.   That's helpful.
 9           During the period from 2007 to the
10   present, where on the scale of magnitude has the
11   Nigerien supply of U308 ranked among the suppliers
12   to Exelon?
13      A.   To Exelon?  They're essentially one of
14   our second-tire suppliers.  So this represents
15   six, eight, ten percent of our annual purchases.
16      Q.   Wow.
17      A.   It's a small market.  So there aren't
18   that many suppliers.
19      Q.   But in terms of dollar -- in terms of
20   the expenditure on U3O8 by Exelon --
21      A.   Uh-huh.
22      Q.   -- the supply from SOPAMIN is six to
23   ten percent; am I understanding that correctly?
24      A.   I think that's roughly correct.
```

**Page 27**

```
 1      Q.   That's interesting.
 2      A.   Probably rank them third or fourth or
 3   fifth, maybe.
 4      Q.   Got you.
 5           Now, to return to Niamey, your meetings
 6   in Niamey, did the Minister of Mines attend any of
 7   the meetings that you had with SOPAMIN outside of
 8   the Minister of Mines offices?
 9      A.   No, he did not.
10      Q.   SOPAMIN had its own headquarters?
11      A.   SOPAMIN was working out of the Mines
12   Ministry Building.
13      Q.   Now, SOPAMIN was a fairly new
14   organization at the time, was it not?
15      A.   SOPAMIN was absolutely brand new.
16      Q.   And did you come to learn during this
17   time period how or why it had been created?
18      A.   No, we did not.
19      Q.   Did you have any concern about entering
20   into a contractual relationship with a new
21   organization that you hadn't investigated?
22           MR. CROKE:  I just want to clarify.  Do
23      you mean Mr. Nevling personally have any
24      concern?
```

**Page 28**

```
 1           MR. SUMMIT:  Yes.
 2   BY THE WITNESS:
 3      A.   No.  And I know that's going to sound
 4   perhaps a little bit strange, but we were signing
 5   up for essentially market-priced pounds, and so we
 6   were actually somewhat indifferent whether they
 7   were actually going to perform or not.  If they
 8   did perform, great.  If they didn't perform, our
 9   hearts were not going to be broken and we would
10   chalk it up to experience and move on.
11   BY MR. SUMMIT:
12      Q.   So the meeting with the Minister of
13   Mines, was there one meeting or multiple meetings?
14      A.   Really just one.
15      Q.   When you say "really just one," does
16   that mean just one?
17      A.   Just one.
18      Q.   All right.  And to the best -- how long
19   did it last?
20      A.   Ten minutes.
21      Q.   And to the best of your knowledge, who
22   was present, to the best of your recollection?
23      A.   I don't really have a specific
24   recollection of who was in the room.
```

**Page 29**

```
 1      Q.   Is that the only time that you have
 2   ever met with this particular Minister of Mines or
 3   any Minister of Mines of Niger?
 4      A.   Yes.
 5      Q.   To the best of your knowledge, was --
 6   withdrawn.
 7           Okay.  And the Minister of Mines, is it
 8   accurate to say that the Minister of Mines was the
 9   only non-SOPAMIN and governmental official --
10   Nigerien governmental official with whom you met?
11      A.   We met very briefly with the Prime
12   Minister.
13      Q.   Who was that at the time?
14      A.   I don't remember the gentleman's name.
15      Q.   Okay.  And you met with him in his
16   office?
17      A.   Yes.
18      Q.   And was the Minister of Mines present
19   at that meeting?
20      A.   He was not.
21      Q.   Who was present at that meeting?
22      A.   I have no specific recollection of the
23   actual attendees.
24      Q.   If I understood your prior account
```

CONTAINS CONFIDENTIAL PORTIONS
James E. Nevling    The Export Import Bank, et al. v. Republique du Niger    11/11/2014

11 (Pages 38 to 41)

### Page 38

1  what has now been marked as Exhibit 7?
2  A. No, I have not.
3  Q. Okay. All right.
4  MR. CROKE: Just to clarify, Exhibit 7
5  is including -- is both the actual letter and
6  then a translation that you --
7  MR. SUMMIT: Yes.
8  MR. CROKE: -- as counsel had made by
9  presumably a translator?
10 MR. SUMMIT: Yes.
11 MR. CROKE: Okay.
12 MR. SUMMIT: Not an official
13 translator; someone who speaks French --
14 MR. CROKE: Understood.
15 MR. SUMMIT: -- and English.
16 BY MR. SUMMIT:
17 Q. Okay. Returning to the contract again,
18 let me ask you this. Looking for a moment at 3.2,
19 Production Page 51?
20 A. Uh-huh.
21 Q. The introductory sentence there,
22 "SOPAMIN will deliver Concentrates of Nigerien
23 origin except that SOPAMIN may deliver
24 Concentrates of a different origin subject to the

### Page 39

1  following conditions," and then it lists a bunch
2  of conditions.
3  Focusing first on the concentrates of
4  Nigerien origin, was it your understanding that
5  those were going to come from a particular mine
6  within Niger?
7  A. Two.
8  Q. Two mines. What were the names of
9  those mines?
10 A. They are Akouta, A-K-O-U-T-A, and
11 Arlit, A-R-L-I-T.
12 Q. Have you ever visited those mines?
13 A. I have not. I've meant to for a long
14 time, but right now, not safe.
15 Q. Yeah.
16 A. Not even close to safe.
17 Q. Okay. And was there -- why did you
18 anticipate, as you apparently did in this
19 contract, that there was a possibility that some
20 of the uranium concentrate might not come from
21 those two mines?
22 A. This is actually relatively standard
23 language which basically simply says it's our
24 expectation that it will come from here, but in

### Page 40

1  the event that there's some sort of difficulty
2  with that, we'll accept other material as long as
3  we're not disadvantaged.
4  Q. Got you.
5  A. So this spells out the terms under
6  which equivalent material could be sourced.
7  Q. Understood.
8  In practice, in the execution of this
9  contract, did concentrates come from sources other
10 than Niger?
11 A. Yes.
12 Q. What sources?
13 A. If you go and you look at the
14 documentation attached for the invoicing, you'll
15 see a number of sources, most of which are
16 affiliates of Areva. Part of this relates to the
17 prior conversation about the difficulties of
18 physically moving the material.
19 Q. Yeah.
20 A. In practice, material from Niger is
21 shipped to France, it goes to a convertor in
22 France in its own account, and SOPAMIN would then
23 arrange to exchange material in France for
24 material either at Cameco or ConverDyn where I

### Page 41

1  needed it. Then in that way someone in North
2  America saves themselves the expense of shipping
3  stuff to France and they save themselves the
4  expense of shipping material in France to North
5  America. It's a very common practice in the
6  industry.
7  Q. Are uranium concentrates -- do you know
8  the term fungible?
9  A. Yes, I do, and they are.
10 Q. Okay.
11 MR. CROKE: Do you want to take a break
12 or anything?
13 THE WITNESS: I'm good.
14 MR. SUMMIT: Thank you. I'd like to
15 take a break in five or ten minutes.
16 THE WITNESS: That's fine.
17 MR. SUMMIT: But we're making good
18 headway.
19 BY MR. SUMMIT:
20 Q. So in 4.2 --
21 A. Uh-huh.
22 Q. -- you see that there's reference to
23 the mine in Niger?
24 A. Yeah.

**Page 62**

```
 1   A.   I don't know.
 2   Q.   Okay.
 3   A.   I haven't -- yeah.
 4   Q.   Did Moussa Harouna assist you and Brown
 5   and LaSalle when you were negotiating the
 6   contract?
 7   A.   He did not.
 8   Q.   Why did you include him on this email,
 9   if you recall?
10   A.   I don't recall.
11   Q.   Okay.  The letter -- you will see in
12   Production Pages 173 to 174, there's a letter --
13   appears to be a letter in French from you to
14   SOPAMIN.
15        Who drafted this letter in French?
16   A.   There was a translator who was hired to
17   do the translation.
18   Q.   Got you.  So you drafted it in English
19   and then it was translated?
20   A.   Correct.
21   Q.   Okay.  And as you'll see, I think, we
22   have an informal translation of that letter
23   attached to the exhibit.  Do you see that?
24   A.   Uh-huh.
```

**Page 63**

```
 1   Q.   And, you know, I think for our present
 2   purposes, the informal translation is adequate.  I
 3   just have a few questions about some of the
 4   references within the letter.
 5        MR. CROKE:  And just before you do
 6   that, I just want the record to reflect that
 7   we've had no chance to confirm whether or not
 8   this is a correct interpretation.
 9        MR. SUMMIT:  I appreciate that.  And
10   you reserve all rights --
11        MR. CROKE:  Yes.
12        MR. SUMMIT:  -- in connection with this
13   informal translation.
14   BY MR. SUMMIT:
15   Q.   Now, first of all, it's addressed to
16   the general manager?
17   A.   I think director general would be a
18   better translation.
19   Q.   Okay.  In French, it's director
20   general.  Was that -- whom were you referring to
21   as director general?
22   A.   At that time the director general was
23   Illiassou.
24   Q.   Okay.  And the second sentence says,
```

**Page 64**

```
 1   roughly, "We understand the material is currently
 2   at Comurhex under SOMAIR's account and that it is
 3   ready to be transferred."
 4        Can you help us out by telling us what
 5   Comurhex is and SOMAIR?
 6   A.   Okay.  Comurhex is a French conversion
 7   facility.
 8   Q.   Is it run by Areva --
 9   A.   It is.
10   Q.   -- or somebody else?  Okay.
11   A.   SOMAIR is the mining company that
12   operates the Arlit Mine.
13   Q.   Is SOMAIR affiliated with Areva?
14   A.   It is.
15   Q.   Okay.  So and then continuing on, it
16   makes reference -- you make reference to
17   Urangesellschaft, U-R-A-N-G-E-S-E-L-L-S-C-H-A-F-T.
18        What is that entity?
19   A.   Despite the German name, that's also an
20   Areva affiliate, and that is their trading
21   organization.
22   Q.   Okay.  And in the interests of time, it
23   might be simplest if you would just summarize for
24   us in simple terms how this particular first
```

**Page 65**

```
 1   delivery was transpiring.
 2   A.   Right.  So SOPAMIN was going to make
 3   arrangements to deliver to UG in France, and UG
 4   was going to make deliveries to us at ConverDyn.
 5   Q.   ConverDyn in Canada?
 6   A.   In the United States.
 7   Q.   In the United States.  Where in the
 8   United States?
 9   A.   The very southern tip of Illinois.
10   Q.   So the physical concentrate was being
11   actually shipped to UG in France?
12   A.   Correct.  At the time of this letter,
13   it says here that it's currently -- it was already
14   in France, currently at Comurhex, but still with
15   the ownership of SOMAIR.
16   Q.   And had you made arrangements for that
17   shipment or had SOPAMIN made arrangements for that
18   shipment?
19   A.   I believe that I made these
20   arrangements.
21   Q.   So you made the arrangements to ship,
22   the shipment went to UG in France, and title still
23   with SOPAMIN?
24   A.   Correct.
```

**Page 70**

1  A.  I don't know that.
2  Q.  Okay.  All right.
3      MR. SUMMIT:  Okay.  Moving along, we
4  are going to mark Production Page 92 as
5  Exhibit 9.
6      (WHEREUPON, Nevling Dep Ex No. 9
7      was marked for ID, as of 11/11/14.)
8  BY MR. SUMMIT:
9  Q.  Now this is November 6, 2007, and the
10 letter we were just looking at was dated
11 November 1, 2007.
12     So this is -- does this refer to the
13 same transaction?  Does this letter that we just
14 marked, the November 6th of 2007 letter, refer to
15 the same transaction?
16 A.  Almost certainly.
17 Q.  Yeah.  What is the role of -- it makes
18 reference to Honeywell's Metropolis facility.
19 A.  Uh-huh.
20 Q.  I take it that's something different
21 from the ConverDyn conversion center?
22 A.  No.
23 Q.  It's the same?
24 A.  It is one in the same.

**Page 71**

1  Q.  Ah, okay.  That clarifies a little
2  mystery.
3      MR. SUMMIT:  Okay.  Now let's look at
4  Production Pages 179 through 182.
5      MS. FAHEY:  183.
6      MR. SUMMIT:  That's fine, too.
7      Let's mark this as the next
8  exhibit.
9      (WHEREUPON, Nevling Dep Ex No. 10,
10     was marked for ID as of 11/11/14.)
11 BY MR. SUMMIT:
12 Q.  Now, the first document is an email
13 that seems to go to you from Harouna, Moussa.
14     Who is he?
15 A.  Moussa is Benoit's man --
16 Q.  Oh, yes.
17 A.  -- in Niger.
18 Q.  He says to you in this email, "Hi,
19 James.  Here the bills for payment to SOPAMIN.
20 Best regards, Moussa."
21     Why -- was he forwarding you invoices
22 from SOPAMIN?
23 A.  Yeah -- I'm sorry.  Was the question
24 why?

**Page 72**

1  Q.  No, that was the next question.
2      Why was he forwarding you invoices from
3  SOPAMIN?
4  A.  I would be speculating.  I think it had
5  to do with Moussa being marginally conversant in
6  English.
7  Q.  Okay.  Makes sense.
8      Now, you'll see at Page 180 --
9  A.  Yeah.
10 Q.  -- a document.  Was this a document
11 that was attached to the email from Moussa?
12 A.  There's no real way to tell, but --
13 Q.  Well, let's put it this way:  Was this
14 to the best of your recollection a bill for
15 payment to SOPAMIN?
16 A.  So it appears to be.
17 Q.  Okay.  And you'll see that at the top,
18 it says, "Republique Du Niger, Ministere des Mines
19 et de l'Energie."  And then it goes on to say,
20 "Societe de Patrimoine des Mines du Niger."
21     Is this to the best of your
22 recollection the form in which the invoice came to
23 you?
24 A.  I don't have a specific recollection,

**Page 73**

1  but it's -- it's possible, I suppose.
2  Q.  But you have no reason to doubt that
3  this is the form in which it came to you?
4  A.  No.
5  Q.  Okay.  You'll see below in this sort of
6  address area, it says, "Contact."  Perhaps it
7  means contract?
8  A.  Oh, yeah.
9  Q.  And "Release" and "CPA."
10 A.  Those are -- go ahead and ask your
11 question.
12 Q.  Was this a contract number that
13 referred over to the first contract that we were
14 looking at earlier, the contract of 2007?
15 A.  Yes.  Those are our internal Exelon
16 payment system numbers.
17 Q.  Okay.  And does "Release 1" refer to a
18 sequence of releases of uranium concentrate?
19 A.  Yeah, individual deliveries.
20 Q.  Got you.  And what does "CPA" stand
21 for?
22 A.  Contract Payment Authorization.
23 Q.  I see.
24     And the payment arrangements, do you