

**Mavronicolas & Dee LLP**
*Attorneys at Law*

February 16, 2015

**By ECF and Email**
The Honorable Andrew L. Carter Jr.
United States District Court
Southern District of New York
40 Foley Square, Room 435
New York, New York 10007
ALCarterNYSDChambers@nysd.uscourts.gov

      Re:      The Export-Import Bank of the Republic of China v. Republique
                   Du Niger, 97 Civ. 3090 (LAK)
                   Corrections to Interested-Third-Party SOPAMIN's
                   <u>Memorandum of Law, dated February 10, 2015 (Dkt. 75)</u>

Dear Judge Carter,

      We represent the Interested-Third-Party SOPAMIN in the above captioned matter. We write to call Your Honor's attention to, and to correct, the following scrivener's errors in the Memorandum of Law in Support of Vacating a Temporary Restraining Order and In Support of a Protective Order Restraining Execution Efforts, submitted by the undersigned on behalf of SOPAMIN, dated February 10, 2015 (Dkt. 75) ("SOPAMIN MOL"):

    (i)      Please ignore the footnotes 3 and 4 in the footer of page 2; our PDF conversion of the SOPAMIN MOL resulted in the obvious formatting error. Footnotes 3 and 4 appear correctly at pages 7 and 8, respectively.

    (ii)     Page 9-10 of the SOPAMIN MOL contains a quotation to the recent case *Universitas Education v. Nova Group, Inc*., 2015 U.S. Dist. LEXIS 435 (S.D.N.Y. Jan. 5, 2015), noting that the case was attached. We failed to attach *Universitas* to the SOPAMIN MOL but do so herewith.

    (iii)    The footer of page 17, which should be marked as footnote 5 (correlating to second sentence in the first full paragraph of that page), contains a block quotation from this Court's decision in *NML Capital, Ltd. v. The Republic of Argentina*, No. 09-7013, 2011 U.S. Dist. LEXIS 14795, 2011 WL 524433 (S.D.N.Y. Feb.

        15, 2011).  That important decision does not contain a citation to an official reporter and is therefore attached hereto.

        We must also note that the citation to that case erroneously indicated that it was affirmed by the Second Circuit. However, there was no appeal to that decision, rather, the same court dismissed the amended complaint in *NML Capital, Ltd. v. Republic of Argentina*, 892 F.Supp. 2d 530 (S.D.N.Y. 2012).

(iv)    The last sentence in the first full paragraph at page 17 should refer not to the *Kalamazoo* case cited above therein, but to D.C. Circuit case *McKesson Corp v. Islamic Republic of Iran*, 52 F.3d 346 (D.C. Cir 1995) as having been distinguished in its latter decision *TransAmerica Leasing Inc v. La Republica de Venezuela,* 200 F.3d 843, 852-853 (D.C. Cir. 2000).

We apologize for this inconvenience and ask the Court to consider the extremely limited time frame in which the undersigned had to file SOPAMIN's opposition papers.

Should the Court request that undersigned file a correct version of the SOPAMIN MOL reflecting these changes, we would be happy to promptly comply.

        Respectfully,
        Mavronicolas & Dee LLP

        Peter C. Dee

**CC: Via Email Attachment**
Sullivan & Worcester LLP:
asolomon@sandw.com, rlombardo@sandw.com, cfahey@sandw.com

Sidley & Austin LLP:
tmarcus@sidley.com, djorgensen@sidley.com, hharrison@sidley.com, jennifer.clark@sidley.com, pcroke@sidley.com

amavronicolas@mavrolaw.com



**UNIVERSITAS EDUCATION, LLC, Petitioner, -v- NOVA GROUP, INC., Respondent. NOVA GROUP, INC., Petitioner, -v- UNIVERSITAS EDUCATION, LLC, Respondent.**

No. 11CV1590-LTS-HBP,No. 11CV8726-LTS-HBP

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2015 U.S. Dist. LEXIS 435*

**January 5, 2015, Decided
January 5, 2015, Filed**

**PRIOR HISTORY:** *Universitas Educ., LLC v. Nova Group, Inc., 2014 U.S. Dist. LEXIS 143667 (S.D.N.Y., Oct. 8, 2014)*

**COUNSEL:** [*1] For Universitas Education, LLC, Petitioner (1:11-cv-01590-LTS-HBP): Paula Kae Colbath, LEAD ATTORNEY, Michael Steven Barnett, Loeb & Loeb LLP, New York, NY; Bryan Isaac Reyhani, Reyhani Nemirovsky LLP, New York, NY.

For Daniel E Carpenter, Movant (1:11-cv-01590-LTS-HBP): Dan E. LaBelle, LEAD ATTORNEY, Halloran & Sage, Westport, CT; Anthony Joseph Siano, Sole Practitioner, White Plains, NY.

For Donald Trudeau, Halloran & Sage, LLP, Molly Carpenter, Amanda Rossi, Movants (1:11-cv-01590-LTS-HBP): Dan E. LaBelle, LEAD ATTORNEY, Halloran & Sage, Westport, CT.

For Wayne Bursey, Movant (1:11-cv-01590-LTS-HBP): Dan E. LaBelle, LEAD ATTORNEY, Halloran & Sage, Westport, CT; Stephen Vincent Manning, LEAD ATTORNEY, O'brien, Tanski & Young, LLP, Hartford, CT; M. Hatcher Norris, Butler Norris & Gold, Hartford, CT.

For Caldwell Life Strategies Corporation, Movant (1:11-cv-01590-LTS-HBP): Stephen Thomas Heiser, Arkin Kaplan Rice LLP, New York, NY.

For Nova Group, Inc., as Trustee, Sponsor and Named Fiduciary of The Charter Oak Trust Welfare Benefit Plan, Respondent (1:11-cv-01590-LTS-HBP): Roger Lee Stavis, LEAD ATTORNEY, Gallet Dreyer & Berkey LLP, New York, NY; Ira Kleiman, Brief Justice Carmen & Kleiman, [*2] LLP, New York, NY.

For Grist Mill Trust Welfare Benefit Plan, Respondent (1:11-cv-01590-LTS-HBP, 1:11-cv-08726-LTS): Glenn Alan Duhl, LEAD ATTORNEY, Siegel O'Connor O'Donnell & Beck, P.C., Hartford, CT.

For Grist Mill Capital, LLC, Avon Capital LLC, Respondents (1:11-cv-01590-LTS-HBP, 1:11-cv-08726-LTS): Carole Rose Bernstein, Law Offices of Carole R. Bernstein, Westport, CT.

For Richard S Order, Nonparty Filing Motion for Emergency Protective Order, Miscellaneous (1:11-cv-01590-LTS-HBP): Richard Steven Order, LEAD ATTORNEY, Updike, Kelley & Spacey, P.C., Hartford, CT.

For Mr Joseph M Pastore, Miscellaneous (1:11-cv-01590-LTS-HBP): Joseph M. Pastore, III, Pastore Shofl & Daily, LLP, Stamford, CT.

For Smith, Gambrell & Russell, LLP, Miscellaneous (1:11-cv-01590-LTS-HBP, 1:11-cv-08726-LTS): Andrew William Schilling, Buckley Sandler LLP, New York, NY.

For Jack E. Robinson, Miscellaneous (1:11-cv-01590-LTS-HBP): Jack E. Robinson, Benistar, Stamford, CT.

For USAA, Miscellaneous (1:11-cv-01590-LTS-HBP): Michael Evan Gorelick, LEAD ATTORNEY, Abrams, Gorelick, Friedman & Jacobson, P.C., New York, NY.

For Nova Group, Inc, as Trustee, Sponsor and Named Fiduciary of the Charter Oak Trust Welfare Benefit [*3] Plan, Petitioner (1:11-cv-08726-LTS): Roger Lee Stavis, LEAD ATTORNEY, Gallet Dreyer & Berkey LLP, New York, NY.

For Universitas Education, LLC, Respondent (1:11-cv-08726-LTS): James Timothy Shearin, LEAD ATTORNEY, Pullman & Comley, LLC (Bridgeport), Bridgeport, CT; Paula Kae Colbath, LEAD ATTORNEY, PRO HAC VICE, Loeb & Loeb LLP, New York, NY; Michael Steven Barnett, Loeb & Loeb LLP, New York, NY.

For Daniel Carpenter, Respondent (1:11-cv-08726-LTS): Anthony Joseph Siano, Sole Practitioner, White Plains, NY.

For Mr Joseph M Pastore, ADR Provider (1:11-cv-08726-LTS): Joseph M. Pastore, III, Pastore Shofl & Daily, LLP, Stamford, CT.

For USAA, Miscellaneous (1:11-cv-08726-LTS): Michael Evan Gorelick, LEAD ATTORNEY, Abrams, Gorelick, Friedman & Jacobson, P.C., New York, NY; Alexandra Elizabeth Rigney, Abrams, Gorelick, Friedman & Jacobson, P.C(1 Bat. Pk. Plz), New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

MEMORANDUM OPINION AND ORDER

Judgment confirming a $30 million arbitration award against Nova Group Inc. ("Nova") was entered in these cases in 2012. (See docket entry no. 41.)[1] Extensive post-judgment discovery and turnover proceedings ensued. In August 2014, [*4] the Court entered judgment against several affiliates of Nova's former principal Daniel E. Carpenter in respect of funds fraudulently conveyed to those affiliates. Judgment creditor Universitas Education, LLC ("Universitas"), thereafter served restraining notices on fraudulent conveyance judgment debtor Grist Mill Trust ("GMT") and several other entities, directing the restraint of GMT's property. GMT and non-judgment debtor third party Sickness, Accident, Disability Indemnity Trust 2005 ("SADI") filed an application for an Order to Show Cause as to why an order should not be entered, pursuant to *New York Civil Practice Law and Rules ("CPLR") section 5240* and *Federal Rule of Civil Procedure 69*, limiting the restraining notices to allow them to pay certain death benefits to beneficiaries of life insurance policies purportedly held in trust. In the application, GMT represented that the restraining notices were also impairing its ability to maintain ordinary commercial banking relationships and pay operational expenses, but indicated that those issues were being negotiated with Universitas and financial institutions and were likely to be resolved consensually.[2] The Court entered the order to show cause on November 14, 2014.

> 1  Docket [*5] entry numbers in this Memorandum Opinion and Order refer exclusively to those in case number 11 Civ. 1590.
> 2  The Court entered a consent order modifying the restraining notices issued to allow GMT to enter into new banking relationships, subject to certain restrictions, on December 31, 2015 (docket entry no. 544).

GMT, SADI, and certain other Carpenter affiliates are apparently in the business of providing life insurance benefit arrangements under which employer entities and/or the Carpenter affiliates pay premiums on policies that are held by the Carpenter affiliates and death benefits payable on the policies are subject to certain claims of the affiliates. The arbitration award and judgment in Universitas' favor arise from one such arrangement.

SADI, which is not a judgment debtor, claims that third parties are refusing to deal with it because of its affiliation with judgment debtors and/or Carpenter affiliates whose names are similar to those of fraudulent conveyance judgment debtors. It requests an instruction or other clarification that it is not the subject of Universitas' restraining orders. This issue, which the parties have undertaken to resolve consensually, is not addressed in [*6] this Memorandum Opinion and Order.

Non-parties Gerald H. Williams, Keith Kornovich, Mark Kornovich, and Minneapolis Trailer Sales, Inc. (the "Beneficiaries"), who claim that they are entitled to the transfer of certain insurance policies currently held in the name of GMT, each move separately for a protective order and for sanctions against Universitas for allegedly unlawfully restraining life insurance policies written by Lincoln Financial Group ("Lincoln") in which the Beneficiaries claim interests. Universitas moves, pursuant to *CPLR section 5225(b)* and *Federal Rule of Civil Procedure 69*, for turnover of a certain insurance policy held

by GMT, the beneficiary and insurer of which are not parties to this action.

Upon review of the submissions in connection with the applications and motions, it became clear to the Court that the resolution of the controversies concerning the insurance policies would require determinations as to the nature and extent of the rights of GMT, relevant beneficiaries, and possibly other parties in those policies. The various participants in these proceedings take diverse positions as to the extent, if any, to which the subject insurance policies and/or their proceeds constitute property of GMT that is subject [*7] to execution in aid of collection of the judgment in favor of Universitas. Prior to the hearing on the Order to Show Cause, the Court entered an order directing GMT, SADI, and the various movants to "address [at the hearing] whether motions for protective orders modifying restraining notices and for turnover of assets are appropriate vehicles in this federal action for determination of interests of judgment debtor Grist Mill Trust, the other movants, and unrepresented third parties in the disputed assets. Specifically, the movants should address whether the pending summary proceedings concerning disputed legal and factual issues should be dismissed without prejudice to plenary proceedings in appropriate fora with all necessary parties joined." (Docket entry no. 532.)

The Court held a hearing on December 16, 2014. Post-hearing submissions were filed on December 19, 2015. The Court has carefully considered the submissions and arguments of the Beneficiaries, GMT, SADI, and Universitas and, for the following reasons, the motions are dismissed and the order to show cause is withdrawn to the extent it concerns the payment of insurance proceeds, without prejudice to appropriate separate proceedings [*8] in fora of competent jurisdiction concerning the parties' respective rights and obligations in connection with the disputed insurance policies.

DISCUSSION

It is well settled that, because the federal courts are of limited jurisdiction, the Court may, at any stage of the proceedings, raise the question of subject matter jurisdiction and dismiss pending litigation if such jurisdiction is found to be lacking. *Fed. R. Civ. P. 12(h)(3)*; *John Birch Soc'y v. National Broadcasting Co., 377 F.2d 194, 199 (2d Cir. 1967)*.

The pending order to show cause and motions, having been initiated in these cases after judgment was entered and in connection with collection efforts, invoke the court's ancillary jurisdiction. The principal questions before the Court are whether such ancillary judgment enforcement jurisdiction extends to the determination of disputes as to whether particular property belongs to the judgment debtor and, if such jurisdiction exists, whether the Court will exercise that jurisdiction where potentially interested parties are absent and other fora and procedural mechanisms are available.

The Supreme Court recognized in Peacock v. Thomas that, without "the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments [*9] . . . the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *516 U.S. 349, 356, 116 S. Ct. 862, 133 L. Ed. 2d 817 (1996)* (internal quotation omitted). In Peacock, the Court nonetheless held that a post-judgment determination that a non-party individual was liable for the obligation of the judgment-proof corporate debtor on the basis of veil-piercing was beyond the proper scope of ancillary jurisdiction in aid of judgment enforcement. *Id., at 358-59*. The Court characterized attachment, mandamus and garnishment proceedings involving third parties as falling within a federal court's ancillary enforcement jurisdiction, *id., at 356*, but "cautioned against the exercise of jurisdiction over proceedings . . . where the relief [sought is] of a different kind or on a different principle than that of the prior decree," *id., at 358* (internal quotation omitted).

In *Epperson v. Entertainment Express, Inc., 242 F.3d 100 (2d Cir. 2001)*, the Second Circuit concluded that "fraudulent conveyance actions operate as simple collection mechanisms; they do not present a substantive theory seeking to establish liability on the part of a new party not otherwise liable." *Id., at 107*. The Circuit thus held that "claims for fraudulent conveyance were within the scope of the enforcement jurisdiction of [*10] the district court" notwithstanding the limited parameters of such jurisdiction as delineated by the Peacock Court. Id.

In this case, prior to the instant motion practice, the Court entertained post-judgment fraudulent conveyance-based claims initiated as turnover motions against GMT and other entities closely related to the judgment debtor Nova, in which the funds that were the subject of the judgment against Nova were traced to GMT and its affiliates, and judgment was entered against GMT and other affiliates for the amounts of funds fraudulently conveyed to or through each of them. (See docket entry nos. 341 and 474.) The judgments did not rely upon any separate bases for liability of the transferee entities, and no issues of competing claims of ownership of particular assets were implicated. By contrast, the instant motions and applications for the turnover of insurance proceeds, protective orders, sanctions, and transfers of policies are premised on the assertion of rights based on trust agreements, insurance policies, and other contracts that were not involved in the underlying arbitration and original judgment enforcement proceedings, nor implicated in the

subsequent fraudulence [*11] conveyance proceedings. The movants' theories for recovery from the subject property are wholly separate from the theories upon which judgments were entered previously. Not only are there disputes among the parties before the Court, but it appears that other beneficiaries, insurance companies, and policy premium payors who are not involved in these proceedings may have interests in or concerning the policies at issue here.

Such attenuated proceedings are well beyond the scope of the ancillary jurisdiction that is necessary and appropriate to ensure that the Court can "function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." See *Peacock, 516 U.S. at 354* (internal punctuation and citation omitted); *Estate of Ungar v. Orascom Telecom Holding S.A.E., 578 F. Supp. 2d 536, 548-51 (S.D.N.Y. 2008)* (exercise of ancillary enforcement jurisdiction inappropriate where determination sought is in the nature of alter-ego theory).

Accordingly, the Court will dismiss without prejudice the motions and will withdraw the order to show cause insofar as they are dependent on the determination of competing claims of rights in assets or the rights of absent parties. Specifically, the protective order motions of the Beneficiaries will be dismissed, as they seek judicial [*12] approval of stipulations providing for the relinquishment of GMT's claims of rights in insurance policies for consideration that Universitas argues is inadequate. Universitas' turnover motion will also be dismissed, as it turns on the premise that insurance policy proceeds currently in the hands of a third party insurance company under a policy with a named beneficiary other than GMT are the property of GMT and thus subject to execution.

The Beneficiaries' applications for sanctions must likewise be dismissed, as their assertions of impropriety rest on the same legal assertions concerning rights in the policies.

Even if ancillary enforcement jurisdiction is pliable enough to empower the Court to determine these competing claims to the insurance policies and proceeds, the Court declines to exercise the jurisdiction, as state court and separate federal proceedings (to there extent there are independent bases for federal jurisdiction) are available to the interested parties, and it appears that necessary parties have not been joined in at least some of the instant proceedings. Furthermore, given the scope of GMT's business and similar business issues of affiliated judgment debtors, engagement [*13] of the substance of disputes regarding the judgment debtors' rights in particular assets would portend extensive litigation unrelated to the original subject matter of the captioned actions, which would be an inappropriate use of scarce judicial resources insofar as such controversies were presented as ancillary enforcement disputes in connection with the captioned actions. See, e.g., *Priestley v. Panmedix Inc., 18 F. Supp. 3d 486, 496 (S.D.N.Y. 2014)* (declining, on grounds of judicial efficiency, to resolve complex post-judgment fee dispute where debtor claimed state law allowed it to proceed against 20 creditors, in part because the debtor was not precluded from proceeding against creditors in state court).

The question of the effect of the restraining notices on GMT's ability to conduct banking operations has, as noted above, been resolved by consent order. The Court will consider any stipulation or proposed order concerning the relationship of SADI to the instant proceedings that may be presented to the Court in the future. Similarly, the Court will consider any consent application concerning the scope and effect of the restraining order served on The Penn Mutual Life Insurance Company (see docket entry no. 543).

CONCLUSION

For the foregoing reasons, [*14] GMT and SADI's applications for protective orders, the Beneficiaries' motions for protective orders and for sanctions, and Universitas' motion for turnover are each denied, and the Court's Order to Show Cause is withdrawn, without prejudice to appropriate proceedings in fora of competent jurisdiction.

The Order resolves docket entry numbers 498, 502, 507, and 517.

SO ORDERED.

Dated: New York, New York

January 5, 2015

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge



4 of 4 DOCUMENTS

NML CAPITAL, LTD., Plaintiff, -- against -- THE REPUBLIC OF ARGENTINA
and ENERGÕA ARGENTINA S.A., Defendants.

09 Civ. 7013 (TPG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2011 U.S. Dist. LEXIS 14795*

February 15, 2011, Decided
February 15, 2011, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at *NML Capital, Ltd. v. Republic of Argentina, 2012 U.S. Dist. LEXIS 123933 (S.D.N.Y., Aug. 29, 2012)*

**COUNSEL:** [*1] For NML Capital, Ltd., Plaintiff: Charles Richard Jacob, III, Haynee C. Kang, Joel M. Miller, LEAD ATTORNEYS, Miller & Wrubel, P.C., New York, NY.

For Energia Argentina S.A., Defendant: Martin Domb, LEAD ATTORNEY, Akerman Senterfitt, LLP, New York, NY.

For The Republic of Argentina, Defendant: Carmine D. Boccuzzi, Jr, Christopher P. Moore, Jonathan I. Blackman, Cleary Gottlieb Steen & Hamilton, LLP(NYC), New York, NY.

**JUDGES:** Thomas P. Griesa, United States District Judge.

**OPINION BY:** Thomas P. Griesa

**OPINION**

This action represents another attempt by NML Capital, Ltd. ("NML") to hold a third party--this time EnergÕa Argentina S.A. ("ENARSA"), an energy corporation majority-owned by the Republic of Argentina (the "Republic")--liable for its judgments against the Republic based on an alter ego theory. NML has judgments in numerous actions against the Republic arising from the Republic's December 23, 2001 default on its sovereign debt. There has been no payment of these judgments by the Republic and NML has been religated to seeking recovery against property. Because the Republic does not keep substantial funds or assets in New York, plaintiffs have been attempting to recover against funds in the hands of Argentine entities [*2] other than the Republic, on the theory that the Republic has recoverable interests in such funds.

For that reason, on August 7, 2009, NML filed a complaint against the Republic and ENARSA seeking a declaratory judgment that ENARSA is an alter ego of the Republic and further seeking a money judgment holding ENARSA jointly and severally liable for the Republic's obligations on the defaulted bonds, specifically on the judgments against the Republic, currently totaling more than $1.5 billion.

The Republic and ENARSA filed separate motions to dismiss the alter ego complaint. Defendants assert that the court lacks subject-matter and personal jurisdiction over ENARSA, and that the complaint fails to state a valid claim for relief. The Republic further asserts that NML has failed to join an indispensible party, ENARSA, by failing to effectuate proper service of process. As will be explained, the jurisdictional issues and the issue regarding the validity of the claim on the merits are all involved with the alter ego question.

The court concludes that NML has not made a showing that ENARSA is an alter ego of the Republic, and on that ground the complaint is dismissed, with leave to replead.

Case 1:97-cv-03090-LAK-SN   Document 84   Filed 02/16/15   Page 8 of 12

Page 2
2011 U.S. Dist. LEXIS 14795, *

**The** [*3] **Complaint**

Although ENARSA is a nominally independent *sociedad anonima*,[1] the complaint alleges that it is a *de facto* administrative agency, a mere extension of the Argentine Ministry of Planning. ENARSA was established to insert the Republic into the energy industry. One of the prime functions of ENARSA is to sell natural gas at low prices for the benefit of Argentine citizens. The Republic subsidizes ENARSA for the losses it incurs. It is alleged that the Republic has assets in New York and elsewhere in the United States in the form of debts, tangible property, and intangible property, held nominally in the name of ENARSA, which, according to the complaint, are available to be applied against NML's outstanding judgments because ENARSA is so thoroughly controlled by the Republic that it is an alter ego of the Republic.

> 1   A *sociedad anonima* is a stock corporation that is an independent, juridical entity with its own legal personality.

The complaint alleges that there are three basic ways in which the Republic dominates ENARSA's activities.

1. Ownership and Management

ENARSA is almost entirely owned by the Argentine national government. The only other shareholders are Argentine provincial [*4] governments, which own less than 3% of ENARSA's shares. ENARSA was created in 2004 at the instigation of then-President Nestor Kirchner through the enactment of two laws: Law No. 25.943, which called for ENARSA's establishment and set forth its structure and purposes, and presidential Decree No. 1692/2004, by which the president approved of its by-laws.

Under Law No. 25.943, the Argentine national government must always own at least 53% of ENARSA's shares and cannot be placed in a minority situation by any changes in the bylaws or charter. Although this law also allows for 35% of ENARSA's shares to be sold to the public, they have never been sold or distributed to the public. In any event, such shares would have no voting rights, and no private investor could hold more than 3% of these public shares.

The complaint alleges that under the founding statute and decree, the Republic is to have five seats on a seven-person board of directors, the other two seats going to provinces. The complaint also contains a recitation of the powers of the board, provided for in the corporate bylaws, which are in fact stated in general terms but which are alleged to allow the board to engage in the day-to-day [*5] activities of ENARSA.

2. Compliance with National Policies and Government Regulations

It is alleged that ENARSA was established to give the state control over the energy industry in Argentina. Both of the founding laws (Law No. 25.943 and Decree No. 1692/2004) state that in its activities and operations ENARSA shall "comply with the policies of the national government." It is alleged that control by the Republic is exercised through the Argentine Ministry of Planning.

NML alleges that the Ministry of Planning dictates the quantity, price of purchase, and price of sale for ENARSA's natural gas transactions. By Decree 2067/2008, the Argentine President created a public trust fund to pay for natural gas to be imported by ENARSA when the Ministry of Planning declared that such imports were necessary to meet Argentina's natural gas demands. In 2009, the Ministry of Planning enacted a "Total Energy" program, which required that: (1) ENARSA must design a system to supply liquefied natural gas to the Argentine market to satisfy domestic demand; (2) ENARSA must purchase liquefied natural gas from international sources at international market prices; and (3) the Ministry of Planning and the Secretary [*6] of Commerce will set the price at which ENARSA can sell this liquefied natural gas in the Argentine market. NML offers one example of this program's application: in 2007, ENARSA was required to sell gas purchased from Bolivian sources to Argentine consumers at half the purchase price.

Executive Decree No. 267/2007 requires ENARSA to transport natural gas from the border between Argentina and Bolivia through certain Argentine provinces via a pipeline whose construction is funded by the Argentine government. This executive order followed an agreement between the Bolivian government and the Republic of Argentina requiring ENARSA and its Bolivian counterpart to sign a contract for the delivery of natural gas.

Also, the complaint alleges that the Republic signed an agreement with the government of Venezuela that required ENARSA and Venezuela's state-owned energy company to engage in joint exploration projects to find oil in Venezuela's Orinoco Belt and off the coast of Argentina. In addition, ENARSA is said to be tasked with supplying "gasoil" to the state-owned corporation that administers the electrical sector, at prices NML claims are highly beneficial to that entity. ENARSA is further [*7] required to purchase energy from plants using renewable sources under a program launched by the Argentine Secretary of Energy.

NML also refers to news article from 2007 which state that ENARSA chartered a private plane from Venezuela to Argentina for the purpose of transporting $800,000 in campaign contributions for Christina

Case 1:97-cv-03090-LAK-SN   Document 84   Filed 02/16/15   Page 9 of 12

Page 3
2011 U.S. Dist. LEXIS 14795, *

Fern·ndez de Kirchner's presidential campaign while her husband was president. NML claims that this "illicit campaign contribution" created an international scandal that resulted in a federal trial in Florida against several individuals who sought to bribe an official to prevent him from speaking about the campaign contribution.

3. Financial Control

NML alleges that ENARSA relies entirely on the Republic for funding because the Republic requires ENARSA to engage in unprofitable activity (offering natural gas to the public at a steep discount) and because ENARSA has never sold its shares to the public to encourage private investment.

ENARSA received almost all of its initial capital from the Republic, and the annual budget is provided by Congressional appropriation and approved by the Economy Minister. ENARSA is also funded by various public trusts controlled by the [*8] federal Ministry of Planning.

The Argentine government provides billions of pesos in subsidies to ENARSA, and the energy sector in general. For example, the government-mandated program to provide Bolivian gas to Argentine consumers, a program which NML claims results in severe losses for ENARSA, is heavily subsidized by the government. In 2007, the government paid ENARSA over 8 billion pesos for this program. In 2008, energy subsidies in general grew to 16 billion pesos. NML claims that the government has allocated an additional 15.224 billion pesos to the subsidy for the energy sector, to compensate for the difference between the purchase price of Bolivian gas, LNG and Fuel Oil and the domestic sale price in 2009.

The Argentine government also operates major public works contracts through ENARSA for which government funds are used. NML offers several examples. First, there is the Argentine-Bolivian project referred to earlier. Second, ENARSA's portion of a joint pipeline expansion in one Argentine province will be funded by the Ministry of Planning's public trusts. Third, ENARSA is currently receiving offers to build five electric plants and eleven small thermal plants, all of which [*9] will be built using the Republic's funds. Fourth, almost half of the funds required for ENARSA's hydrogen fuel cell project are supplied by the Republic.

NML alleges that the government also provides several concessions to ENARSA for no compensation. For example, ENARSA was granted concessions for oil exploration in national maritime areas. Several of these concessions have been subject to exploration agreements with other state-owned and private oil companies, for which ENARSA has not been required to contribute any funding, but other companies have. ENARSA was also given the right to establish a database comprised of valuable information relating to all Argentine oil fields. In order to establish this database, private oil companies operating in Argentina are required to provide seismic surveys, geological studies, and other proprietary information.

NML alleges that because Argentina uses ENARSA to enact its energy policies, by forcing ENARSA to undertake unprofitable activities to the extent that ENARSA is entirely dependent on the Argentine government for financing, Argentina is the sole beneficiary of ENARSA's activities.

**Discussion**

Joinder

The Republic argues that NML has failed to [*10] join an indispensable party, ENARSA, by failing to effectuate proper service of process.

NML served the complaint on ENARSA through the process prescribed by the Hague Convention. Service under the Hague Convention is an acceptable method for serving complaints in U.S. actions against foreign governmental entities under the Foreign Sovereign Immunities Act ("FSIA"). *28 U.S.C. ß 1608(b)(2)*. NML states that on or about October 7, 2009, the contractor designated by the U.S. Department of State for service of process under the Hague Convention served the summons and complaint on the Argentine Ministry of Foreign Affairs, the central authority in Argentina designated by the Republic to receive documents transmitted pursuant to the Hague Convention.

The court rules that this constituted proper service. However, there is still a question about personal jurisdiction as to ENARSA, as will now be discussed.

Jurisdiction and Merits of the Complaint

There is a dispute as to whether NML has pled a sufficient jurisdictional basis over ENARSA. Personal jurisdiction over a foreign state exists where there is subject-matter jurisdiction and service has been made in accordance with the FSIA.

> Personal jurisdiction [*11] over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under *subsection (a)* where service has been made under *section 1608* of this title.

*28 U.S.C. ß 1330(b)*. As already stated, ENARSA was properly served. Subject-matter jurisdiction exists where

Case 1:97-cv-03090-LAK-SN   Document 84   Filed 02/16/15   Page 10 of 12

Page 4
2011 U.S. Dist. LEXIS 14795, *

the foreign state or instrumentality is not entitled to immunity under the FSIA, which provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in *section 1603(a)* of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under *sections 1605-1607* of this title or under any applicable international agreement.

*28 U.S.C. ß 1330(a).*

For purposes of applying the FSIA, an instrumentality of a foreign state has immunity to the extent provided in the FSIA just as much as the foreign state itself. Indeed, in the definitions section of the FSIA, a "foreign state" is defined to include an instrumentality of a foreign state. *28 U.S.C. ß 1603(a)* and *(b)*. This means that ENARSA is presumptively immune from the jurisdiction of United [*12] States courts unless an exception specified in the FSIA applies. *28 U.S.C. ßß 1604* and *1605*. Thus, the burden shifts to NML to demonstrate that one of the exceptions articulated in the FSIA applies. *RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 393 (S.D.N.Y. 2009)*. One of these exceptions is waiver. *28 U.S.C. ß 1605(a)(1)*.

The Republic has, of course, waived its immunity in agreeing to be sued in the United States on its bond debts. NML argues that ENARSA, as an alter ego of the Republic, is basically a part or department of the Republic, and that therefore the Republic's waiver applies to ENARSA. NML states that the court "also has jurisdiction over this matter pursuant to *28 U.S.C. ßß 1330(a)* and *1605(a)(2)*" because the Republic engages in "commercial activities" in the United States through ENARSA, acting as "agent for and as the alter ego of" the Republic. The court will not discuss the question of whether commercial activities would be an additional reason, in addition to waiver, for jurisdiction. It is sufficient to say that the allegation about commercial activities again depends on the validity of the alter ego theory.

This means that subject-matter jurisdiction and personal [*13] jurisdiction depend on the validity of the alter ego theory, as alleged in the complaint. And, of course, the whole thrust of the complaint, in its allegations on the merits, is the assertion of the alter ego theory. Therefore, the essential question on both jurisdiction and the merits is whether the complaint sufficiently alleges that ENARSA is an alter ego of the Republic.

There is, however, a difference in the standard to be employed on the jurisdictional issues and issues relating to the merits. For reasons which have been discussed, the jurisdictional issues involve *Fed. R. Civ. P. (12)(b)(1)*, dealing with the defense of lack of subject-matter jurisdiction. The summary judgment standard should be employed in deciding a 12(b)(1) motion to dismiss here. *London v. Polishook, 189 F.3d 196, 198-99 (2d Cir. 1999)*.

Nevertheless, the factual presentation on all the issues is essentially confined to the complaint. Therefore, the question on all issues is whether the complaint is sufficient as it relates to the one pivotal question regarding alter ego.

Failure to State an Alter Ego Claim

Pleading Standard

To survive a motion to dismiss, a complaint must plead sufficient facts to state a claim [*14] for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *Ashcroft v. Iqal, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)*.

In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)*.

Plaintiff bears the burden of asserting facts sufficient to establish that an agency or instrumentality should not be presumed distinct from the sovereign. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 252 (2d Cir. 2000)*.

Alter Ego Analysis

The often-cited case dealing with the issues now before this court is *First National City Bank v. Banco Para El Comercio Exterior De Cuba ("Bancec"), 462 U.S. 611, 626-27, 103 S. Ct. 2591, 77 L. Ed. 2d 46 (1983)*. The case dealt with the kind of government instrumentality which ENARSA concededly is. The Supreme Court stated:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes [*15] the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law.

Case 1:97-cv-03090-LAK-SN   Document 84   Filed 02/16/15   Page 11 of 12

Page 5
2011 U.S. Dist. LEXIS 14795, *

> The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*462 U.S. at 624*. The Court stated that "government instrumentalities established as juridical entities distinct and independent from their sovereigns should normally be treated as such." *Id. at 626-27*. Indeed, such instrumentalities "are to be accorded a presumption of independent status." *Id. at 627*. However, the Court examined "whether this presumption may be overcome in certain circumstances." *Id. at 628*. The Court held that there were indeed such circumstances and summarized them as follows:

> Thus, where a corporate entity is so extensively controlled by its owner that [*16] a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other. In addition, our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.

*Id. at 629* (citations and internal quotation marks omitted). See *Letelier v. Republic of Chile, 748 F.2d 790, 794-95 (2d Cir. 1984)*.

The principal-agent exception of *Bancec* has generally been characterized as referring to the question of whether the instrumentality is an "alter ego" of the sovereign. The alter ego relationship may exist if (1) the instrumentality was established to shield the sovereign from liability, (2) the sovereign ignored corporate formalities in running the instrumentality and the sovereign exercised excessive control over the instrumentality, or (3) the sovereign has directed the instrumentality to act on its behalf, and the instrumentality has done so. An alter ego finding is not, however, justified merely because the sovereign wholly owns the instrumentality or exercises its power as a controlling shareholder. See *Letelier, 748 F.2d at 794-95*; [*17] *LNC Invs., Inc. v. Republic of Nicar.., 115 F. Supp. 2d 358, 363-65 (S.D.N.Y. 2000)*, aff'd sub nom. *LNC Invs., Inc. v. Banco Cent. de Nicar.., 228 F.3d 423 (2d Cir. 2000)*; *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991)*; *TransAmerica Leasing, Inc. v. La Republica de Venez., 200 F.3d 843, 848-50, 339 U.S. App. D.C. 385 (D.C. Cir. 2000)*.

As already stated, the Republic in effect owns ENARSA and appoints the controlling majority of its board. The law is clear that, in and of itself, this situation does not create an alter ego relationship. However, NML contends that the Republic so extensively controls ENARSA that it is in effect nothing more than an agent of the Republic.

It is certainly true that the Republic had a substantial degree of control over ENARSA. However, that control was exercised pursuant to publicly announced policies declared and implemented in various statutes and executive decrees, referred to earlier in this opinion. The founding statute and decree stated that ENARSA was required to comply with the policies of the national government. The basic policy objective was to provide a sufficient supply of natural gas to Argentine citizens at prices [*18] which they could afford to pay. Apparently, Argentina did not have a substantial domestic supply of natural gas. Thus, natural gas needed to be purchased mainly on the international market at international prices, and then was usually sold in Argentina at a loss. The Republic subsidized that loss. There was also the arrangement between the Argentine Republic and Bolivia involving the construction of a pipeline and the importation of natural gas from Bolivia into Argentina. ENARSA's role was dictated by the Argentine Republic and sales in Argentina were made at a loss to ENARSA.

Although the complaint deals mainly with natural gas, there are also allegations about oil in Venezuela and "gasoil" which again involve ENARSA in carrying out the basic policies of the Republic to provide fuel in Argentina which the citizens could afford.

However, there are no detailed allegations in the complaint to the effect that the Republic managed the day-to-day business of ENARSA or disposed of the funds of ENARSA in any abnormal manner or in any way designed to treat such funds as funds of the Republic.

To be sure, there is an allegation in the complaint that the

> Ministry of Planning dictates the quantity, [*19] price of purchase, and price of sale for ENARSA's natural gas transactions.

Para. 36. This allegation surely states on its face that the Ministry of Planning dictated the terms of "transactions." However, the claim that the Republic intervened in the daily transactions and affairs of ENARSA, if there is such a claim, is not developed in the complaint with any specific detail. Therefore, the court is unable to construe this allegation as doing anything more than describing what is set forth in the other extensive allegations--that is, broad control by the Republic of ENARSA in order to have ENARSA comply with the basic policies announced in the governing statutes and decrees.

In the view of the court, this does not constitute the type of control which makes ENARSA an alter ego of the Republic, and liable for the Republic's debts. The ENARSA situation is different from what this court dealt with when it held that the central bank of Argentina was an alter ego of the Republic for the purpose of allowing plaintiffs in certain cases to recover against funds deposited by the central bank in the Federal Reserve Bank of New York. *EM Ltd. v. Republic of Arg., 720 F. Supp. 2d 273 (S.D.N.Y. 2010)*. [*20] Also, the court has reviewed other cases where instrumentalities of foreign countries have in fact been held to be alter egos of the governments of those countries. In each of those cases, the foreign government intervened in the affairs of the instrumentality, sometimes with a deceptive purpose, to a degree more extreme than what is shown with regards to ENARSA. See, e.g., *SerVaas Inc. v. Republic of Iraq, 686 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2010)*; *Kensington Int'l Ltd. v. Republic of Congo, No. 03 Civ. 4578 (LAP), 2007 U.S. Dist. LEXIS 25282, at 25-35 (S.D.N.Y. Mar. 30, 2007)*; *Bridas S.A.P.I.C. v. Gov't of Turkm., 447 F.3d 411, 418-20 (5th Cir. 2006)*; *McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 351-52, 311 U.S. App. D.C. 197 (D.C. Cir. 1995)*; *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 616 F. Supp. 660, 666 (W.D. Mich. 1985)*.

A word must be said about the claim that ENARSA should be held liable under that branch of Bancec which states that the presumption of separateness of an instrumentality may be overcome when recognizing the corporate entity as independent would work a "fraud or injustice" against the government's creditors. *462 U.S. at 630*; *Letelier, 748 F.2d at 794-95*. [*21] It is surely true that the Republic has failed to pay its just bond debts and its just judgment debts, and this is, in the view of the court, serious wrongdoing. But, there is no basis whatsoever for any claim that ENARSA has been used to further this objective.

### Conclusion

For the foregoing reasons, the court holds that the complaint fails to plead a valid claim that ENARSA is an alter ego of the Republic of Argentina. The court dismisses the complaint for lack of personal and subject-matter jurisdiction, and for failure to state a valid claim on the merits. However, NML has leave to file an amended complaint within a reasonable time if NML believes that it has grounds for doing so.

This opinion resolves the motions listed as document numbers 18 and 27 in this case.

SO ORDERED.

Dated: New York, New York

February 15, 2011

/s/ Thomas P. Griesa

Thomas P. Griesa

U.S.D.J.